**FILED**

JUN 2 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District Court for the District of Columbia

David Sieverding AKA FATHER
Kay Sieverding AKA MOTHER
Ed Sieverding AKA OLDER SON
Tom Sieverding AKA YOUNGER SON
Plaintiffs in joint AKA FAMILY
All reside at 641 Basswood Ave., Verona, WI 53593
Voice 608 848 5721, Fax 608 845 3201, Email sieverding.kay@sli
(Filing pro se but with full fee paid)

jury trial of any factual disputes

CASE NUMBER   1:05CV01283

JUDGE: Ricardo M. Urbina

DECK TYPE: Pro se General Civil

DATE STAMP: 06/27/2005

*Complaint*

**JURY ACTION**

v.

American Bar Association* 740 15th St. Northwest. Washington D.C. 20005, 202-862-1000.

Jane Bennett, 701 Princeton Ave., Steamboat Springs, CO, 80477 (unpublished phone)

Faegre & Benson, LLP, 90 S. 7th St, Minneapolis, MN, 55402. 303-607-3500.

Hall and Evans LLC., 1125 Seventeenth St. Suite 600, Denver CO 80206, 303-628-3300.

McConnell Siderious, 4700 S. Syracuse St., Suite 200, Denver CO 80237, 612-766-7909.

James B.F. Oliphant, Feldman, Nagel & Oliphant, PO 775628, 919 Oak St., Steamboat Springs, CO 80477, 970-879-6060.

Routt County Court, 522 Lincoln Ave, Steamboat CO 80477, 970-879-5020.

The World Company AKA Lawrence Journal World and the Steamboat Pilot & Today.
609 New Hampshire. P.O. 888, Lawrence, Kansas 66044. 785-843-1000.

U.S. Judiciary, Thurgood Marshall Federal Judicial Building, One Columbus Circle, N.E., Room 6100, Washington DC 20002-8003. 202-502-4250.

White & Steele, 950 17th St., 21st Floor, Denver, CO 80202, 303-296-3131.

1

An Urgent Independent Action

I.) To obtain equitable relief from judgment still restricting liberty issued through 00cv008

Bennett v Sieverding in Routt County Court, Steamboat Springs, Colorado by County Judge

James Garrecht.

II.) Three-part judgment to be relieved in equity pursuant to Rule 9(b)(c) from 02-1950

Sieverding v. Colorado Bar Association District of Colorado: (a) Sieverdings/FAMILYS'

tort and constitutional violation suit, 02-1950, should be dismissed with prejudice, considered

to be on the merits, and have res judicata or claims preclusive effect b.)

Sieverdings/FAMILY should be required to pay $150,000 + in fines labeled defendant's

legal fees and c.) Sieverdings/FAMILY should be enjoined from further litigation "based on

the same events" except through a licensed attorney and if they litigate, they cannot be

allowed to confer with defense counsel on any matter.

III.) For U.S. government financed legal assistance under the Equal Access to Justice Act for

both this action and for federal appellate review of 04-4317, Sieverding v. Faegre & Benson

et al.

IV.) For injunctive relief under Rule 65 to prohibit five publications by the defendants Faegre

& Benson LLC and The World Company mischaracterizing the existing injunctions

discussed herein.

**Jurisdiction** is based on 42 U.S.C. section 1983 (multi-state defendants no state overlap of

location with plaintiffs, Washington D.C. office of defendant most influential in procedural

departures), Fed. Rules of Civil Procedure Rule 60(b), (60)(b)(3), and Rule 65, the

Administrative Procedures Act. Also claim under diversity since one of the judgments appealed under rule 65 is for more than $75,000 and there is total diversity of citizenship since 2001, long before the financial judgment appealed from.

**Preceding Litigation**: The Sieverding Family, hereinafter FAMILY, was victimized in tort and according to the standards of criminal law. They described events involving them and their property, their neighbor, Kevin Bennett, the city council president, his wife, Jane Bennett, and their property, a group of local government officials and government employees financially involved with the city council president, and a group of lawyers acting under the pay and direction of the city council president. They also described events involving another Steamboat citizen (David Criste), not a plaintiff nor a defendant in any action involving FAMILY, who had a major dispute and litigation experience with some of the same players shortly before and overlapping with FAMILY. Citizen Criste's experience with defendant Hall and Evans LLC, contracted by the state agency for handling of applicable government officials, errors, omissions, and crime insurance, was a causal factor in FAMILY'S abuse by the same officials, one of who was a convicted cocaine dealer. Drug dealing factors similar to those described as problems in other locations by the U.S. General Accounting Office and the United Nations Global Programme Against Corruption appeared to have increased vulnerability to government corruption..

The original primary events happened within a space of blocks and involved face-to-face interaction involving all four members of the Sieverding Family. The resort community had only 10,000 people and therefore the number of official actors and law firms was smaller than in a larger community. The community was geographically isolated and a single newspaper

dominated the local market. There was no local television news coverage. The local government was unusually involved in local business through direct payments, various subsidies, and an arrangement involving sales and resort taxes.

Similar bad things do happen to other people. Postings on the bulletin board at the University of Wisconsin unit on international law described a similar situation in Indonesia, for instance.

In this case, the way the events developed was unusual. What was unusual was substantially the background of "MOTHER" plaintiff, Kay Sieverding, and the fact that these events coincided with the development of the Internet. Another unusual factor was that Sieverding had access to the Freedom of Information Act and was able to build up admissible document evidence to support almost every factual point.

After studying the Supreme Court database on-line for several months and considering the legal significance of the Rules of Professional Conduct, in August 2002, Sieverding had a flash of inspiration to add the American Bar Association and the Colorado Bar Association as co-defendants. She has pages of various legal authorities and historical facts supporting that, comparisons to regulatory and self-government responsibilities in other industries, and a table based on a Colorado Supreme Court list of factors causing a duty to care.

It seems certain that various legal scholars believe that the Bars do have a duty to the public to help protect them against torts by lawyers, and help make sure that remedy is accessible if needed. This duty to care, of course, implies liability if negligently performed or recklessly denied, and damages follow, as happened in this case. The Bar Acts and Omissions met the "but-for" standard of causality.

4

An individual lawyer would never sue the ABA like plaintiffs did. They wouldn't risk their career and sales leads. In 02-1950, plaintiffs raised questions that could benefit other citizens. These questions could also force a minor restructuring of the legal industry involving government licensing of bars, or federal regulation of lawyers, as already suggested by some parties.

It was just a coincidence, or gross stupidity, that the local government bullies in Steamboat picked on a MIT graduate who had already studied constitutional law, local government law, regulation theory, public policy analysis, city management, legislation development procedures etc. before moving to Steamboat. Then the defendants underestimated both the rapid development of legal database services on the Internet and the basic academic abilities of plaintiffs to research, analyze, and convey the necessary information. The defense lawyers and lower court judges counted on the pro se plaintiffs getting "struck from the game" by the various dirty procedural tricks they tried. But FAMILY kept watching the dockets, prowling the law library, and surmounting the obstacles to prove their prima facie case and substantiate their damages and their malicious intents.

The injunctions discussed herein are the desperate attempts by the ABA, the CBA, Magistrate Schlatter, and the defense counsel to avoid the consequences to them of their totally perverting the judicial process so that the ABA, CBA, and Hall and Evans LLC wouldn't have to face the questions about their liability to the public that FAMILY brought to litigation. The events described herein were part of a boycott of the basic litigation process. The injunctions, for which this Action requests relief, were part of a continuum of malicious prosecution and abuse

of process as a component of First Amendment Retaliation that began when Sieverding challenged the local judiciary in Routt County Colorado.

In both the Routt County Court proceeding and the 02-1950 federal appeal from that proceedings, David and Kay Sieverding hereby allege that invocation of Rule 60(b)(3) for relief in a nonrendering court is required as a matter of justice because the

"fraud ...defile(d) the court itself or ...perpetuated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudicating cases...shows an unconscionable plan or scheme which is designed to improperly influence the court's decision...and exists ...where there has been the most egregious conduct involving a corruption of the judicial process itself." American Jurisprudence 47 Am. Jur. 2d sect 886 p362.

Plaintiffs request an open mind from the court. There wouldn't be federal criminal statutes related to corruption of the judiciary if these problems hadn't surfaced in the past. This case brings a new chance to "tweak" the system to improve the Administrative Delivery of FULL RIGHTS to FREE CITIZENS. This is the mandate of the U.S. Judiciary.

The injunctions which plaintiffs request equitable relief from are really a form of political punishment because plaintiffs tried to secure more RIGHT TO SUE rights for themselves and other FREE CITIZENS.

## I.) First injunction—"permanent" liberty restraining order originating in Routt County Colorado Court.

1,) The first injunction to be voided is for a civil restraining order that plaintiff Kay Sieverding should stay at all times 30 feet away from her former neighbor Jane Bennett. That order has caused Sieverding much misery in the past, labels her as a criminal and immoral, a "molester", and poses serious risks of discrimination and character assassination in the future.

2.) Plaintiffs, the Sieverding family, meet the requirements under rule 60(b)(3) for relief from a nonrendering court:

    a.) A judgment, which ought not in equity and good conscience, be enforced on the Sieverding Family.

    b.) The Sieverding Family has a good defense to the alleged cause of action on which judgment is founded.

    c.) There was fraud, accident, or mistake in the judgment, which resulted in the Sieverding Family being prevented from obtaining the benefit of their defense.

    d.) There was an absence of fault or negligence on the part of the Sieverding Family.

    e.) There is an absence of any adequate remedy in law.

3.) Before the injunction issued in Routt Country Court in September 2000, the Sieverdings lived next door to Bennetts. They had disagreements starting in 1992 when the Bennetts fenced off and barricaded the road. The Bennetts put up a fence 60 feet from their property line and through oral and in person threats, written threats by their lawyer, and physical barricade claimed the road bed, about 6000 square feet, as their own to the exclusion of Sieverdings, whose residential property adjoined the disputed road bed for a substantial length. The Bennetts also repeatedly launched full sized aerial fireworks about 75 feet downhill from Sieverdings' yard, in violation of national fire safety standards.

4.) In the year 1999, the Bennetts were instrumental in having the Sieverding Family be the only property owners in Steamboat required to have a gardening permit to landscape and care for the strips between their property and the paved street, which the city did not mow or otherwise maintain and which ranged from 18 to 30 feet wide. The Bennetts were also instrumental in the

city government, through its home rule powers and municipal court, threatening Kay Sieverding with up to 6 months in jail for violating a never used restriction on all "tree trimming" within these strips. After getting a letter that was supposed to be a "gardening permit", Sieverdings had, as per local custom and practice, instructed their employee to trim some small branches hanging from a big old willow tree next to their drive, because the branches were hitting their cars when they used the driveway to access their property from the street and undesignated government land. These were common law rights of Sieverdings. The City of Steamboat Springs required the Sieverdings to sign an agreement with Bennetts which involved giving up their street access and selling the Bennetts about $40,000 of strategically located resort land for $1, as a condition of the bogus criminal charges being dropped. This met the classic definition of felony extortion. After getting the land, the Bennetts built on it in extreme violation of local development laws.

5.) On the afternoon of 8/29/00, while standing on the street in front of her home, Plaintiff Kay Sieverding orally told injunction holder, Jane Bennett, that just because Jane's husband was president of the city council that didn't give her the right to violate the law. That was the stated reason for the first injunction appealed from in this action.

6.) When Sieverdings still lived next door to Bennetts, Jane Bennett and her husband Kevin Bennett used the restraining order injunction to scare, embarrass, threaten, and harass the Sieverdings until the Sieverding Family thought they had to move away, selling their property for less than appraised value to associates of Bennetts. On repeated occasions, Jane and Kevin Bennett called the police, who reported to Kevin Bennett in his position as president of the city council, to follow and embarrass the Sieverdings, for non-criminal contact such as going to the store, waiting at a red light, sending a legal notice of intent to sue under the Colorado

Governmental Immunity Act, passing out government corruption flyers at the 4th of July parade, etc. Kevin Bennett lied about where his property line lay to accuse Sieverding of criminal trespass and the police followed her to question her in front of a crowd and the newspaper printed it in one of the articles discussed in this action. The city attorney used Bennett's injunction to threaten Sieverding and her then lawyer for Sieverdings' delivering legal documents to his office over the post office. So there was and is a pattern of misuse of procedure to inhibit Sieverdings' assertions of their constitutional and fundamental rights.

7.) The Bennetts still live in Steamboat Springs, CO, the location of the county court where the injunction was issued, and the Sieverdings moved to Wisconsin in 2001. But that does not mean that Sieverdings don't have a valid interest in their family honor and in being able to visit, ski, or even live in Steamboat Springs. As American citizens, they have the right to live in or travel to any portion of the county they wish. Furthermore, they have special interests in the Steamboat Springs area. Kay, Ed, and Tom Sieverding lived in Steamboat Springs for 10 years; David Sieverding lived there for 24 years, graduated from Steamboat High School, and wrote an eulogy for his father that the Steamboat Paper published in 1980. David's mother and sister lived in Steamboat for years as did, and do, other relatives. David's father, Ray Sieverding, had been a community leader in the 60's, president of the chamber of commerce, and there was and probably still is some residual good will of value to plaintiffs. They have various relationships, friendships in the community.

8.) The Sieverdings have an interest in the status of the large landscaped garden, visible from the street, of their former property, which they designed and planted, based on their great interest in gardening and landscape design. Every year they lived in Steamboat, they did a substantial

amount of downhill skiing. Consequently, it would be easier for them to ski in Steamboat than anyplace else, since the snow is fluffier and more forgiving than in Wisconsin, and since they are familiar with the slopes in Steamboat making it easier to ski successfully with less practice, and can visit friends on the same vacation. Tom Sieverding has been invited to stay in Steamboat this coming August, with a friend he has had since age 5. His parents and older brother should be able to drop him off and visit their old community without fear of harassment or jail.

9.) The 00-cv-008 Bennett v. Sieverding injunction has, in effect, branded Kay Sieverding has "delinquent", "criminal", "deranged", or "lacking moral turpitude" and made David Sieverding seem strange and stupid also. It defames the family name. The order is listed in various databases and, as discussed below, is published by the defendants on the Internet. The combination of the order and the publication on the Internet interferes with plaintiffs self confidence and negotiating abilities, as they can never know who, of all the people they interact with, have seen it or will see it.

10.) The Sieverding name is very unusual. The extended family has emphatically expressed an interest in the continuation of the name. No other persons named Kay Sieverding or David Sieverding come up on "Google.com". The injunction reduces the value of Sieverdings' MIT degrees and other professional qualifications. David Sieverding authored six issued patents and if the family changes their name because of the defamation they will lose some of that intangible asset.

11.) Plaintiffs were advised by the ex-wife of David Sieverdings former boss, a woman who worked as a public relations consultant for the Sieverdings in the 1980's for a product that eventually reached $12 million in sales, that no one would ever employ them or invest in any

business enterprise with them as long as the Bennett v. Sieverding injunction is known. They

had fallen from contact with this woman for some years. She found the injunction on the

Internet when she was trying to find Sieverdings' current contact information and called them of

her own accord to emphasize to Sieverdings how important they get the Bennett v. Sieverding

injunction voided and the record corrected.

12.) Kay Sieverding has an excellent defense to the alleged cause of action on which the

judgment was founded. **The judgment was not based on the record or on the law.** It was

unconstitutional.

13.) The notice of Jane Bennett's action for injunction accused Sieverding of "harassing" Jane

Bennett. Sieverding did not receive notice of any other basis. She has a right to presumption of

innocence.

14.) Routt County Court Judge Garrecht said in court on September 6, 2000 in front of the

newspaper reporter Tom Ross, agent of one defendant The Steamboat Pilot Today AKA The

World Company, a closely held corporation)/ WorldWest LLC /Simons Family Management:

"before the court can issue the restraining order, the Court needs to find that the defendant has
attacked, beaten, molested, or threatened the life of the plaintiff or threatened to do serious
bodily injury to the plaintiff, and that unless restrained and enjoined will continue to attack, beat,
molest, or threaten the life of the plaintiff or threaten to do serious bodily harm to the
plaintiff...obviously, Ms. Bennett has not been attacked, beaten, and her life hasn't been
threatened." (Transcript CO Routt County 002180 Sept./6/00 page 161).

15.) After the witness testimony was completed, the county judge changed the charge from

harassment to "molestation" and pronounced his opinion that Sieverding was guilty of

"molesting" Jane Bennett and therefore the injunction should issue because someone in Denver

unaffiliated with the Steamboat parties had shot someone in a parking dispute and that was

predictive since the Bennetts and the Sieverdings also had a parking dispute. "Molesting" has a

common definition meaning "annoy" but that is neither criminal nor sanctionable thru injunction. You can't legally get an injunction to restrict your neighbor's physical liberty because your neighbor annoyed you by complaining that you were violating a statute. That is abuse of process.

16.) According to Black's Law Dictionary, "molestation" has two legal definitions. One means simply "criminal harassment" which the County Judge found did not exist. The other is "sexual molestation". However, the two women never had sexual contact. In open and an ex parte proceedings, Jane Bennett never claimed to be closer than 6 feet to Sieverding.

17.) Acting without a warrant and without support of a police signature or a police report indicating a crime, Jane Bennett had, with the assistance of the police who reported to her husband, effectuated a citizens' criminal action against Sieverding, alleging criminal harassment based on a stalking statute. The criminal charges were eventually dismissed and the prosecutor, Wittemyer, supervising district attorneys, McLimans and St. James, and Routt County Judge Garrecht all refused to even give Sieverding a statement of probable cause as to why the citizens criminal complaint against Sieverding was held open from August to March, 2001.

18.) Some evidence supporting plaintiffs' assertion of intrinsic fraud on Routt County Court.

a.) In the court appearance before Colorado District Judge Thompson (in same court building) on August 31, 2000, Judge Thompson asked Jane Bennett "She's (referring to Kay Sieverding) not following you around town, or anything like that?" Jane Bennett answered, "Uh, I don't believe so" (Transcript Routt County 002180)

b.) In the court appearance before Judge Thompson on August 31, 2000, Judge Joel Thompson asked Jane Bennett "She's not calling you late at night" (referring to Kay Sieverding). Jane Bennett replied "She may have called me in the night years past. I can't remember the date. She called one time... that was like a couple of years ago" (Transcript Routt County 002180 August/31/2000 page 6 lines 7-10). 180 August/31/2000, page 5 lines 17-18)

c.) In the court appearance before Judge Joel Thompson on August 31, 2000, Judge Joel Thompson asked Jane Bennett "There has been no offensive touching?" Jane Bennett answered "no". "She hasn't shoved, or pushed, or kicked, or anything like that? Jane Bennett "Not me, no." (Transcript Routt County 002180 August/31/2000).

d.) In the court appearance before County Judge James Garrecht on September 6, 2000, Kay Sieverding asked Jane Bennett if they had any interaction between a planning department meeting when Kay Sieverding had suggested they go out for coffee in the winter of 2000 and August 29, 2000 and Jane Bennett answered, "I don't recall interacting with you." (Transcript Routt County 002180 Sept./6/2000 pages 93-94).

e.) Kay Sieverding asked Jane Bennett about their conversation about a week before the restraining order hearing when Jane Bennett was leaving a neighbor's house directly across from Sieverdings' drive, asking "Did I say anything to you on any other subject other than the smelling of smoke that being the day that the condominiums burned?' and Jane Bennett answered "No". (Transcript Routt County 002180 Sept./6/2000 page 93 lines 10-20).

f.) In the court appearance before Judge James H. Garrecht on September 6, 2000, Kay Sieverding asked Jane Bennett "Have I ever physically threatened you?" and Jane Bennett answered, "I don't know what you mean." (Transcript Routt County 002180 Sept./6/2000 page 99 lines 4-7)

g.) Marc Wilk, Jane Bennett's employee and witness, testified under oath on September 6, 2000, that he had seen Kay Sieverding approximately 20 times in the 60 + days proceeding 8/29/00 when he worked outside at the Bennett's residence next to Sieverdings and that on those occasions Sieverding was gardening. (Transcript 09/06/2000 p. 33, lines 4-10.) Kay Sieverding asked Marc Wilk "when you saw me, did I seem like I was going about normal business, with the possible exception that I garden more than most people do?" (Transcript Routt County 002180 Sept./6/00 p. 35 lines 23-25) Marc Wilk, Bennetts' employee and witness, answered, "Well you know, yes" (Transcript Routt County 002180 Sept./6/00. 36, line 1.)

h.) In the court appearance before Judge James H. Garrecht on September 6, 2000, Jane Bennetts' witnesses claimed that Kay Sieverding had not used any obscenities on the date and location that Jane Bennett claimed (nor did they claim any other time).

i.) The complete police report is available for case P0004988 and the defendants were given a copy by Sieverding. (For clarity and readability, the report is summarized here: The two pages is a fill in the blank form called "Offense Report". One of the categories is "Type of criminal

activity". None of the categories are checked. The only sections that are filled in are the identifier information for Jane Bennett and Kay Sieverding.

j.) The next page is a typed summary by the police officer. What is says about Sieverding's activity is "when (Jane Bennett) stopped at the stop sign at Pahwintah and Merrit, Kay started honking her horn". Then it neglects to mention that Sieverdings went home and that neither Kay nor her son who was with her were interviewed by the police, nor that honking one's horn is not illegal. The report then continues "Kay came running down from her yard….but did not cross onto their property". "Kay kept yelling that her husband just can't break the law because he's council president."…"That Kay called her husband an asshole"….Kay kept shouting phrases "you're breaking the law, obey the constitution and you can't build that thing". (Kay) yelled something about violating the building codes." "Kevin (Bennett) told Kay to leave. At that time she left". The remainder of the report is handwritten versions of the same. There was also a supplemental report, which said that Jane Bennett had gone to the police station. It said that Jane Bennett signed a criminal offense report and a county citation. There was nothing in that police report to indicate that the officer thought a crime was committed. It is the entire case report. The date of the "events" was 8/29/00.

19.) There was fraud, accident and mistakes, which prevented the defendant, Kay Sieverding in the judgment Bennett v. Sieverding from obtaining the benefit of her defense.

20.) Sieverding thinks that the Colorado County judge was probably bribed because

    a.) The county ruled in violation of the law and the record.

    b.) The county judge seemed reluctant to rule that way but Jane Bennett had employed a
        private prosecutor who kept prodding the county judge—"go fish or cut bait".

c.) Jane Bennett's husband, Kevin Bennett, said shortly thereafter, at a tape recorded city council meeting, that he has spent $8,000 on legal fees related to Sieverding and that was excessive when compared to the length of the oral hearing and preparation for it

d.) Since judges are almost never criminally prosecuted and face no civil liability for accepting bribes there was no reason other than conscience for him not to take a bribe.

e.) These events happened in a community of 10,000 with only one news outlet so that a small group of lawyers working with the news outlet could suppress public knowledge of the underlying events.

f.) The presiding county judge, James Garrecht, predicted that plaintiff would be unable to hire a lawyer

g.) The county judge refused to let Sieverdings introduce defense evidence about motive

h.) The county judge predicted in the civil hearing that Sieverding would be found criminally guilty, which is also against the Canons of Judicial Responsibility

i.) The county judge refused to process all of plaintiffs' motions to review and overturn the injunction.

j.) The county judge did not insist that Jane Bennett provide a statement of irreparable injury if the injunction did not issue. That is an essential element for an injunction.

k.) The restraining order agreements is used in Colorado primarily after a plea bargain or as part of a divorce and is not supposed to be a substitute for a criminal trial. The fill in the blank form used for this restraining order was primarily about child custody and the injunction was written when the other categories did not fit.

l.) The instructions left Jane Bennett with the impression that Sieverding was required to run

into traffic to get away from Jane Bennett or she could be jailed. This is against the

Magna Charta and the Constitution. Based on the judge's instructions, Bennett reported

to the district attorney that she had followed Sieverding through a store trying to take her

picture to prove that she was within 30 feet of Sieverding so she could get Sieverding

jailed.

21.) Part of Sieverdings' defense was that the Colorado Rules of Professional Conduct were

supposed to be followed as preventative regulation. Jane Bennett's attorney Randall Klauzer

was not supposed to instigate a disciplinary action in order to get an advantage in a civil action

and he wasn't supposed to be aiding and abetting the Bennetts' criminal violations of

development laws and official misconduct. The police weren't supposed to let Jane Bennett

have or sign the criminal citation against Sieverding because none of them observed a crime.

Klauzer wasn't supposed to suborn perjury or testify himself from the courtroom floor that

Sieverding had molested Jane Bennett. The Colorado Bar Association was supposed to publish

warning brochures about attorney misconduct and put them in the library and the county court

house. The various attorneys who were aware of the matter were supposed to report it to the

Colorado Attorney Regulation Counsel and also tell Sieverdings. Klauzer & Tremaine was

supposed to refrain from assisting client fraud. There were supposed to be institutional

protections defending Sieverding from malicious prosecution and abuse of process.

22.) The introductory TRO was issued by a different judge in the same court complex, Judge

Thompson. That judge's live-in girlfriend finance was charged by the U.S. Drug Enforcement

Agency with cocaine trafficking less than a year after the injunction issued. (The criminal

charges of the judge's girlfriend were, according to the Steamboat Pilot, filed after the Steamboat police and the judge had a dispute about the handling of a murder case. The police changed the subject and, in open court, threatened the judge's girlfriend in a conversation that sounded like there had been some sort of blackmail or collusion in the past. Given that the city council president Kevin Bennett was well connected to both the local police and the local drug scene, it is very likely that he too would have known that the judge's finance was probably a cocaine importer and trafficker, thus raising a distinct possibility that he blackmailed Judge Thompson into issuing the temporary restraining order which led into the injunction appealed from in this action.

23) Jane Bennett's husband, Kevin Bennett, was a known cocaine user, rumored to be a cocaine dealer in Steamboat Springs, and had previously been incarcerated in federal prison for possession of cocaine with intent to sell. The DEA had listed the Steamboat Springs area as a concentration of high illegal drug use. In related litigation, 02-1950 Sieverding v. CBA et al, Sieverding had supplied multiple items of hearsay evidence that the chief of police Art Fiebing was known to be a former cocaine user. That evidence was repeatedly submitted and was never refuted by the defense. Also, one of Sieverdings' former lawyers, Sandra Gardner, had done small time criminal defense and operated a pro se clinic in the same court-house and she said that she suspected that the Steamboat police sold drug evidence but she never filed an official complaint about it. She also said that her boyfriend had almost had a fight with Bennett in the grocery store after her boyfriend pantomimed a snorting motion to Bennett.

24.) When the Sieverdings at various times introduced this background of drug related crime, in their 02-1950 proceeding to get equitable relief, the magistrate called plaintiffs discussion of

drugs in Steamboat "foul garbage" and "struck" many of the documents even when Sieverding found parallels in a Government Accounting Office Study on Drug Related Police Corruption. The magistrate was required to recognize the truths of modern life -- "there is government and judicial corruption and some of it is drug related". That must be the presumption, not that all government officials and all court officials never do anything wrong. That is like saying that priests never do anything wrong. Evidence of the commonality of government corruption is available for the reading and it often starts with someone like Kevin Bennett coveting his neighbor's land.

25.) At the 9/6/00 county court hearing in which the Bennett v. Sieverding injunction was issued, Sieverding's defense, although adequate, was hindered because a.) The county judge would not allow them to submit evidence as to Jane Bennett's ulterior motive, to cover-up her and her husbands' building, on that very day, in violation of the local zoning and development laws as to amount of accessory building, number of detached dwelling units per lot, front set-backs, and driveway location/angle to the street to allow for safe exit, b.) Even though criminal sanctions and liberty restrictions were at stake, the judge did not offer a continuance to get a lawyer, even after Sieverding said she had tried to get one but been unable, c.) The county judge did not offer a continuance so that she could testify in her own behalf, even though the proceedings lasted from 1:15 to 6:30 p.m. and Sieverding, who had cross examined witnesses during most of that time, said she was too tired to testify. d.) The County judge repeatedly allowed accusations not in the notice e.) there was no discovery, not even a list of witnesses, and the plaintiff did not get the police report until the day of the trial, which she only had three business days notice of. e.) The county judge allowed a private prosecutor, allowed him to

18

testify from the floor without being on the witness stand, and allowed various other lapses of due process such as nonspecific accusations in the presence of witnesses to be called that the accused looked intimidating and the witnesses had asked not to be "subjected" to her presence. f.) According to the U.S. Supreme Court (Winshop, 90 S. Ct. 1068, 397 U.S. 358 (U.S. 03/31/1970)) in a discussion of juvenile liberty restrictions and criminal labeling similar to the restrictions applied to Sieverding, criminal procedure rules and presumption of innocence is supposed to apply.

26.) Even though she had such short notice, Kay Sieverding was not negligent in her defense. She brought with her to trial a certified copy of the local development laws and evidence of Bennetts' building in violation of the local laws, although the county judge would not allow anyone to read from the laws. She researched the law of harassment and did prove that there was no harassment, as the county judge acknowledged. She subpoenaed two local police officers as character witnesses, who did show up and testified favorably in her behalf. Even though she wasn't an attorney, Sieverding adequately crossed all the witnesses to get the testimony needed to acquit her. There was no jury, nor none offered.

27.) Colorado laws specify that the remedy for the injunction is to the issuing court and that it can be altered and modified at any time. The criminal charge made by Jane Bennett was dismissed and Routt County Judge Garrecht had said on 9/6/00 the injunction would go away with the end of the criminal charge. But the injunction did not disappear and is still in effect and County Judge Garrecht refuses to modify it. Sieverding promptly paid for the transcripts and wrote to the county judge explaining that the record and the law did not match, that there had been perjury, etc. but he simply refused to process her motions and fined her for making them.

28.) After the civil injunctive action, Bennett v. Sieverding, issued, Sieverding hired two

different attorneys in Steamboat Springs, William Hibbard and Sandra Gardner, and paid the two

of them together about $4,000. The Sieverdings asked both of them how to get relief from the

judgment. Both said they didn't know how.

29.) Sieverding tried to get relief from the injunction before federal court, in 02-1950, as

discussed below. In his recommendation and report, issued after ex parte collusion shown with

quotations from court documents, the federal magistrate did not even mention that plaintiffs had

asked for injunctive relief. The defense including Jane and Kevin Bennett, and their attorney

who got the injunction, Randall Klauzer, did not file a statement of disputed facts even when

Sieverdings filed for summary judgment. They refused to answer plaintiffs interrogatories even

when they filed two motions in court-- one asking for the reason for the injunction Bennett v.

Sieverding and one asking for the probable cause for the criminal complaint placed by Jane

Bennett. When the supervising federal judge, Judge Nottingham, reviewed the magistrate's

report and recommendation, in a one-page document he dismissed Sieverdings' complaint as

"incomprehensible" and "legally twisted" and did not mention plaintiffs' application for

injunctive relief.

30.) The injunctive relief requested from the Routt County Court action was a part of a

complaint for damages with 29 defendants which got complicated as described below. Their

action for injunctive relief was dismissed as moot. Plaintiffs appealed that to the 10th Circuit in

04-1143 but the panel on the merits didn't even acknowledge that action for injunctive relief

even existed. Plaintiffs pointed that out in a petition for rehearing but that was denied without

reason and the Court of Appeals mandate, which was very short, doesn't mention the words "injunction" or "restraining order".

31.) It is impracticable for plaintiffs to apply up in Colorado court nor have they been successful in out of court resolution thru Bennett's lawyers. Sieverdings have conflicts with both the other judges ruling in Routt County. Sieverding sued one of them, Paul McLimans, for his acts and omissions related to malicious prosecution of them and also his offices refusal to acknowledge their complaints of having been extorted by land and land access by local government officials. The other one, Judge O'Hara, is a long time partner of private attorney, James B. F. Oliphant. Oliphant was another of Bennetts' attorneys and on their behalf, wrote a letter justifying their blockading and converting the road in front of Sieverdings' former home to exclusive use by the Bennetts. After the malicious prosecution, the issuing of the injunction, defamation in the newspaper etc., Oliphant bought Sieverdings' home for $100,000 less than appraised value, in full knowledge of the appraised value and that Sieverdings did not believe they could safely live there, and that the real estate agents were saying people were afraid to buy the property. Exhaustion is not required as a condition of Rule (60)(b)(3) relief.

32.) Jane Bennett's lawyer, Randall Klauzer, without stated reason or replacement, resigned from Bennett v. Sieverding. Jane Bennett refused service of recent attempts Sieverding made to have the criminal records corrected under a special Colorado statute and the County court sent back her check and the state forms for criminal record correction she had downloaded, filled out, and had notarized. According to their verified bill, the district attorney, St. James, met with the city attorney, Lettunich, and was convinced not to respond to any of Sieverdings' communications.

33.) Plaintiffs spent days at the U. of Wisconsin law library but were unable to figure out any other way to get adequate remedy at law from the injunction Bennett v. Sieverding, other than this action, to be relieved of criminal and liberty sanctions, applied in violation of due process, the record, and the law. The U.S. Supreme Court does not review evidence and accepts few cases.

34.) If they went back to federal court in the District of Colorado, they would be automatically assigned to the same magistrate judge, O.E. Schlatter. He obviously hates plaintiffs because they upset him by suing lawyers, whom the magistrates said, on 1/30/03, have qualified immunity that is the same as immunity and means no money for plaintiffs in tort even if the lawyers lie about the facts and the laws. The magistrate refused to recuse himself or address the plaintiffs due process complaints and the U.S. Judiciary does not currently offer an evidentiary hearing on judicial due process suspensions through normal channels. As discussed below, the magistrate suspended modern pleading and lied about the evidence.

35.) Just this month, Magistrate Schlatter dug up a two year old filing to try to trick plaintiffs into admissions contrary to the facts if they did not timely respond to a new recommendation and report related to an action plaintiffs had not pursued. That action was related to Jane Bennett's husband Kevin Bennett threatening to shoot a potential buyer of Sieverdings' property and obstruction of justice related to follow-up to an email the lost buyer had sent plaintiffs in September 2003. However, in a document issued 6/1/2005, Magistrate Schlatter did not acknowledge that there was a shooting threat by a tort defendant but wrote that the complaint concerned the sharing of a social network and bathroom facilities. Plaintiffs filed a motion for a

ten-day extension of time on 6/15/05, based on the fact that on 6/11/05 they had been injured in a roll over car accident and the magistrate just refused to acknowledge their motion.

36.) Plaintiffs had repeatedly asked to have the Magistrate recused, and outright accused him of lying, ex parte collusion, and obstruction of justice and he just refuses to acknowledge their evidence and complaints. He boycotted motions for almost a year. The U.S. legal services industry claims to have the right to totally deny services to particular citizens with disfavored actions, but the U.S. Judiciary is taxpayer funded and cannot legally boycott citizen actions.

37.) Plaintiffs also complained to the U.S. Judiciary and all they got was a post card telling them to complain under Title 28 section 351 (a) which they already did to no effect. That does not get the complaining party an evidentiary hearing as guaranteed by the Administrative Procedures Act or an answer directed to the complaint. The wording of section 351(a) is directed to infirm, drunk, and senile judges not to those acting contrary to law. Because the injunction against Sieverding did not proceed through the criminal process, habeas corpus is not available.

38.) "A federal court may issue injunctive relief against state court proceedings in a civil rights case." American Jurisprudence 2nd 47.

"a federal court is not wholly without power to order injunctive relief against state judges for violations of civil rights" Mitchum v. Foster, 407 U.S. 225, 32 L. Ed. 2d 705, 92 S. Ct. 2151 (1972)

**II. Three-part judgment to be relieved in equity pursuant to Rule 9(b)(c) from 02-1950 Sieverding v. Colorado Bar Association District of Colorado: (a) Sieverdings/FAMILYS' tort and constitutional violation suit, 02-1950, should be dismissed with prejudice, considered to be on the merits, and have res judicata or claims preclusive effect b.) Sieverdings/FAMILY should be required to pay $150,000 + in fines labeled defendant's**

legal fees and c.) Sieverdings/FAMILY should be enjoined from further litigation "based on the same events" except through a licensed attorney and if they litigate, they cannot be allowed to confer with defense counsel on any matter.

39.) The 10th Circuit and Judge Nottingham both relied on Magistrate Judge's Schlatter's report on the case. That report fraudulently misstated the facts as pled and undisputed and the actual record of the case. The R&R and failure to correct the misstatements of law and fact in it were obtained through collusion with defense counsel to suspend modern pleading and the rules of civil procedure as written. Relief is due under Rule 60(b)(3).

40.) Sieverding v. Colorado Bar Association 02-1950 might have been a garden variety "first amendment retaliation" / "trespass on chattels through constitutional violations with personal damages and as well as property damages" / "civil conspiracy through malicious prosecution, abuse of process, and defamation/aiding and abetting extortion and other criminal conduct" or "tortuous government corruption" case except for one distinction: some sort of legal history was established when the state and national bar associations were included as civil defendants.

41.) The plaintiff, Kay Sieverding, had studied policy analysis at MIT and constitutional law through a joint MIT/Harvard program. She thought, and still thinks, that the bar associations were proximate causes to the intentional torts and criminal activities in Steamboat. David Sieverding also believes this and apparently so do various lawyers, professors, and scholars they have consulted.

42.) For instance, plaintiffs recently tried to hire David Boises, a famous attorney, and emailed him various documents which they discussed with his office. He wrote back that he had reviewed their emails, but did not say that he thought their claims on the bars were frivolous.

43.) In 2000, Sieverding wrote to an old co-worker, Mark Kleiman, who is a graduate of the Kennedy School of Government, a tenured public policy professor at UCLA, and a former Justice Department employee and asked his advice. Kleiman emailed back that it sounded like RICO to him.

44.) Sieverding also consulted repeatedly with their attorney in Steamboat Springs, William Hibbard, a graduate in good standing of the University of Minnesota Law School and a successful sole practioner for years. She had asked him in 2000, while the criminal charges against her were still pending, why he thought the events in Steamboat Springs had unfolded as they did and he said it was because she was unrepresented. He wrote that her theories about bar liability were "interesting" and is always very nice whenever she calls him.

45.) "**it is the bar itself that disciplines the bar** and most citizen complaints end up going nowhere. The organized bar seems to lack zeal for self-policing.... approved (rules of professional conduct) in 1983...but whether these laws really work or whether they work in the public interest—remains an open question" American Law in the 20th Century. Friedman P.469

46.) Apparently the Federal Trade Commission has some sort of difficulty with the American Bar Associations position on attorney fraud.

47.) Both the ABA and the CBA are private organizations run for the financial benefit of members with no public review at all, despite the fact that they claim to set the standard for attorney conduct, historically restricted membership based on ethics and competence, campaign against public regulation, and have codified responsibilities to the public. Both the ABA and the CBA support the concept of denial of service to the public. Neither acknowledges that they or their members have any liability, responsibility, or duty to the public.

48.) In the 02-1950 action, the plaintiffs/Sieverdings/FAMILY also sued a large law firm, Hall & Evans LLC, in their role as insurance claims agent for public officials errors and omissions and employee crime insurance reinsured through Lloyd's of London and Traveler's responsible as proximate causes.

49.) The Federal Court in the District of Colorado engaged in a fierce, wholesale campaign of First Amendment Retaliation against the Sieverding Family because FAMILY asserted that attorneys engaged in tortuous and criminal conduct towards them and that the BARS were reckless and negligent in performance of their assumed duties towards the public. Victims of torts and crimes have a fundamental and First Amendment Right to raise allegations and file lawsuits against those who injured them. The perpetrators choose the victim. The victim does not choose the perpetrator.

50.) Because of the privileged position of the victimizer, Magistrate Schlatter chose to re victimize the Sieverding Family by denying them the process due, by effectively suspending the rules of civil procedure, by suspending the summary judgment process, by suspending any and all interrogatory reply obligation, by suspending the requirements of Rule 65, by ignoring the rules of evidence including 201, and by ignoring or misrepresenting the FAMILY's complaint, verified declarations, government document evidence, motions, and cited legal authorities. Even though the American legal profession has been able to deny remedial services to victims of lawyers in the past does not mean that these victims should continue to have their 42 U.S.C. section 1981 Right to Sue civil rights denied.

51.) The U.S. Supreme Court allowed public transportation to be segregated despite the written civil rights laws until Rosa Parks took her stand for FREE CITIZENS. Rosa Parks wasn't a

lawyer, a college professor, a politician, nor a minister; just a woman who made a conscious decision to fight for, and risk herself for, THE RIGHTS OF FREE CITIZENS. Why did it take Rosa Parks to stop segregated public transportation when the equal rights laws were already on the books? She saw the difference between law as written for citizens and law as received by citizens.

52.) Sieverdings are tired of being humiliated, segregated, and oppressed by lawyers and judges who misuse legal process. They demand the right to sue lawyers, the right to the rules of civil procedure as written, access to legal assistance by an advocate for their interests, and courteous treatment by all process participants. These are fundamental and constitutional rights. As far as what should be done with corrupt judges, like Magistrate Schlatter and County Judge Garrecht, maybe the Catholic church experience with abusive priests will offer some precedence. Citizens must insist that the court system including its personnel and those professionally licensed must first and foremost serve the sacred mission of the court system by providing a safe, convenient, inexpensive, fair, and timely forum for redress of our grievances.

53.) Magistrate Schlatter ruled:

"**Plaintiffs' claims that they were owed duties by the lawyers, law firms, or the bar associations are** beyond frivolous. Their claims are **downright absurd.**
Plaintiffs assert, for example, that the lawyers breached some ill-conceived duty to plaintiffs when the lawyers sent them letters that contained opinions about the law that plaintiffs considered incorrect; that the lawyers owed to plaintiffs a duty to ensure that plaintiffs' legal rights and needs were protected, and that the lawyers breached a duty to plaintiffs when the lawyers failed or refused to present to the lawyer disciplinary agency plaintiffs' complaints about other lawyers....fraud and deceit because he made "deceitful statements ...implying that blockage of the road was legal...had written to Sieverdings pretending to be a legal authority...knew Sieverdings were hurt partially because of his deceits but refused to help them...Klauzer law firm for, among other things (which the magistrate declines to mention)...facilitating the Bennetts' building in violation of the city zoning and development laws ...obstruction of justice and civil conspiracy...the remaining claims against lawyer defendants are similarly foolish.

....seek to sue the ABA, n part, for fraud and deceit "for claiming the American attorney service industry is self-regulating, down playing problems with attorney misconduct, and pretending that tort actions against attorneys for attorney fraud, abuse of process, defamation, and other intentional torts performed by an attorney in the course of business are somehow impossible. They charge that the ABA is guilt of 'reckless negligence, nonfeasance, malfeasance, and misfeasance' for 'interfering with the Sieverding Family's right and ability to sue the lawyer defendants with the assistance of an attorney...The claims against the CBA are similar and similarly ridiculous.

Plaintiffs' complaints are filled with additional examples of unfounded assertions in regard to The CBA, the ABA and the lawyer defendants. Nothing would be served by attempting to list all of those examples here. Suffice it to say that **plaintiffs were warned repeatedly during the...conference of 1/30/03 that none of the lawyer defendants or the Bar Associations owed any legal duty whatsoever to plaintiffs, and that all of plaintiffs' claims in this regard were foolish and frivolous.**" (p. 33-34 of his R&R available through PACER or ECF at District of MN insurance contract action 05-ev-0002-DWF-JSM D. 5, exhibit one filed by CIRSA. The effective complaint for 02-1950 is also posted on the 05-002 ECF docket, D 14 attachment 1. It is shorter than Magistrate Schlatters' R&R)

54.) All the bars have to do to limit their liability is to apply for a license and offer public input into rules, regulations, and programs to protect the public and take substantive steps to protect the public in accordance with what is recommended by international commissions. Most states already license state bars. Plaintiffs had specifically suggested that the bars add material about attorney liability in tort, such as is already privately published through the closed to the public BNA web site, to their available to the public web site. Similar measures involving paper brochures had been suggested by the McGee Commission in 1983 but were not implemented in Colorado, one of the states with lower levels of attorney regulation. Around the world, state of the art judicial programs already offer such input. There is no reason that U.S. citizens can't have all the rights, in actuality, offered by the United Nations International Covenant on Civil and Political Rights. Organizations such as the Minnesota

55.) The Minnesota Bar Associations has already publishing about the perils of powerless boards and self regulation and the former president of the New Jersey bas association has suggested that

Congress could regulate attorneys. Standard lawyers errors and omissions insurance sold all over the world and required in many countries is already covering some of the claims that Magistrate Schlatter suggests that attorneys have immunity for.

56.) All the orders, judgments, and injunctions on plaintiffs resulting from 02-1950 meet the five essential elements for relief under Rule 60 (b)(3). All are

    a.) A judgment, which ought not in equity and good conscience, be enforced on the Sieverding Family.

    b.) The Sieverding Family has a good defense to the alleged cause of action on which judgment is founded.

    c.) There was fraud, accident, or mistake in the judgment, which resulted in the Sieverding Family being prevented from obtaining the benefit of their defense.

    d.) There was an absence of fault or negligence on the part of the Sieverding Family.

    e.) There is an absence of any adequate remedy at law.

57.) The Sieverding Family has, and had, a fundamental, constitutional, common law, and statutory right to petition the courts for redress of their grievances.

58.) Judge Nottingham said plaintiffs' complaint was "incomprehensible". The 10th Circuit's final order quoted or paraphrased only to the Magistrate's report and recommendation. They wrote "(Sieverdings') suit which purported to state claims against numerous defendants who allegedly violated appellants' legal rights with regard to zoning decisions....the magistrate...sixty-one page recommendation...made as much sense as possible...appellants' arguments are incomprehensible". Thus it is clear that the court did not recognize plaintiffs' first amendment retaliation, constitutional claims, personal damages claims, and motions for

injunctive relief.   At no point did either Judge Nottingham or the 10th Circuit paraphrase plaintiffs' claims or version of the facts or in any other way acknowledge that it read anything plaintiffs wrote.

59.) The defendants did not submit a statement of disputed facts even when plaintiff filed for summary judgment. It is impossible to have a decision based on the merits without a statement of disputed facts. If the problem were related to writing, then the defendants were supposed to file a motion for more definite statement. If the court thought the pleadings were too long or otherwise unclear, it could have asked for clarification. In fact, when plaintiffs asked for particulars on what sentences seemed unclear, the defense and the court refused to answer.

60.) The Sieverding Family, by motion (D 22 filed in January 2003 before any responsive pleading or hearing, as well as civil cover sheet, had selected a trial by jury. They also did not agree to have the magistrate rule on any dispositive motion. When the magistrate made summaries of the evidence that were contrary to the evidence, they objected. None of plaintiffs' evidence, affidavits, declarations under perjury, or document evidence was contradictory.

61.) Plaintiffs showed no bad faith. They were not accused and did not file fraudulently. Furthermore, they did not misquote legal authorities. Thus there was no basis for Rule 11 sanctions on the Sieverding Family. The defense attorneys did violate Rule 11 but the District of Colorado does not allow billings for time lost by pro se litigants. When the Sieverding family filed motions for sanctions their motions were ignored, struck, or declared moot. Nor did the Sieverding family behave in any way improperly. They didn't talk back to the judge, swear, threaten anyone, picket the court, show up at defense counsel's office etc. The defendants did

not file counter claims on the Sieverding family and refused to verify their pleadings. The defendants filed no affidavits or declarations.

62.) The Sieverding Family could not "offer a good defense to the alleged cause of action on which judgment is founded" because there were no accusations for them to defend. They received no notice. When they filed motions asking for evidence of misconduct on their part and copies of two letters from the defenses, which the magistrate cited, but which were not in the record, there was no response to their motions.

63.) The magistrate used the legal bills to be punitive rather than remedial. He allowed the defense to bill for reading motions they didn't respond to and for ex parte contact with the Court. The magistrate awarded the attorney representing the public employees, for instance, to bill over $22,000 even though he only filed a one-page reply with vague references to rule 41 and government immunity. The magistrate allowed a bill of over $11.000 for the city attorney who wrote nothing and instructed the city employees to cease researching the truth of the allegations. The magistrate ordered the FAMILY to pay for the city attorneys' time including the city attorney going to the district attorneys' office and asking the district attorney not to prosecute a complaint for felony false government certificate they had documented and asking the district attorney not to give the FAMILY the probable cause for the criminal prosecution. The magistrate used the legal bills as a First Amendment Retaliation tool to punish the FAMILY for suing the bars. There is no law plaintiffs are aware of that says that a judge can award $150,000 + because he decided to dismiss a case without a trial or a Reply if as plaintiffs you filed no fraudulent affidavits and if you cited recognized causes of action within the statutory period. The Federal

Rules of Civil Procedure require a statutory basis to order payment of legal fees but that was not provided.

64.) There was extrinsic fraud on the Court as well as fraud, accident, or mistake, which prevented the Sieverding FAMLY from obtaining the benefit of their defense to the judgments limiting their future litigation rights and assigning them over $150,000 of penalties.

65.) The injunctions were issued without the requirements of Rule 65. The 10th Circuit requires a special form for motions for injunctive relief with a statement of statutory authority and irreparable harm. The motion, the form, the statutory basis, and all evidence of irreparable harm were missing. The action was not called an "injunction" and Rule 65 was not cited. The word "equity" was not used. There was no written nor oral evidentiary hearing and when plaintiffs tried to understand what was happening and offer a defense it was ignored. The injunctions were extremely vague, seemed meaningless, and mixed in with the Magistrates 59-page R&R document.

66.) Now, defendants and the Colorado magistrate are trying to get the FAMILY jailed for criminal contempt. And they are trying to do so in ways that involve repeatedly misquoting the facts and the record. They have no right to demand any explanation from plaintiffs about anything. They had their time to dispute plaintiffs' statement of fact (over one year), to turn in specific motions for Rule 11 violations or Rule 9 violations, to file counter claims, to file for injunctions under Rule 65, and they didn't exercise those procedural rights when they had a chance.

67.) It is totally contrary to Natural Law, Fundamental Rights, the U.S. Constitution, the Colorado and Wisconsin constitutions, 42 U.S.C. section 1981 right to sue, the 14th amendment,

and the United Nations International Covenant on Civil and Political Rights to restrict plaintiffs First Amendment Rights and Rights to Petition Government in any way. Plaintiffs are FREE CITIZENS, not BROKE PRISONERS and did not file without paying, they paid full fees.

68.) PARENTS/FAMILY cannot be required to hire a lawyer in order to exercise those rights because:

  a.) Any attorney that plaintiffs were to hire would have to work at the pleasure of the plaintiffs as their agent without interference from Magistrate Schlatter or anyone else.

  b.) There have been many problems in past cases with attorneys colluding with opposing counsel. That is a known risk in litigation which is likely to be more of a problem in litigation against lawyers.

  c.) Two of the 02-1950 defendants, Kevin Bennett, former president of the city counsel, and Anthony Lettunich, city attorney, previously threatened FAMILY'S paid counsel, d.) Plaintiffs have apparently been "black-listed" by the professional bar because they sued the bar associations and attorneys in tort

  d.) Plaintiffs requested a draft power from the District of Colorado and it was refused.

  e.) Plaintiffs requested legal assistance under the Equal Access to Justice Act because of violation of the Administrative Procedures Act through ex parte collusion and their motion was denied as "moot".

f.) Under current American law, restaurants and emergency medical facilities have to provide service, but the legal profession can boycott particular citizens or classes of citizens, such as those with claims against lawyers in tort.

g.) The defendants have also boycotted plaintiffs' claims on the public officials errors, omissions, and crime insurance thereby attacking plaintiffs financially so as to render legal assistance unaffordable. They also attacked plaintiffs financially by defaming them on the Internet, causing unnecessary filings, and advancing legal fees after jurisdiction was transferred to the 10th Circuit (which plaintiffs promptly pointed out) and then posting on the Internet, to this day, that plaintiffs owed legal fees, so as to adversely affect their credit and access to capital. This is after one defendant threatened to shoot the children of an investment banker who wanted to buy plaintiffs' extra building lot and reduce the value of their property by changing local laws in a way that adversely affected only their property and benefited only their neighbors, the politicians' property.

69.) The bogus injunctions are also an attempt to render the FAMILY'S self-counsel ineffective both by causing the new court to refuse to review the record and the evidence as required by the doctrine of equitable estoppels and by limiting plaintiffs access to the record of facts and law they laboriously built up over the years of following the directions in James Publishing and other legal authorities for alternatives to proof (through admissions based on uncontroverted declarations).

70.) The magistrate tried to limit the facts and claims by limiting the length of the complaint, although the Federal and Local rules do not have a page nor word limit nor do they exclude

particular information. Plaintiffs started out with a 21,000 word complaint which meets

MicroSoft Word's statistical measurements for legal documents and is within the standard for

complaints as discussed by the U.S. Courts Pro Se Handbook (published by the District of

Northern California), the local rules, and books on legal writing such as Plain and Accurate Style

in Court Papers by Irwin Alterman, published by the ABA. The magistrate ordered them to

squeeze it into 40 pages. To do so, they had to use condensed type, nominally 12 point as per the

local rules. Actually, the District of Colorado exempts pro se litigants from type size

requirements. In any case, if the 02-1950 effective complaint, is put in standard 12-point Times

type, identical to this, it is only 56 pages including exhibits. In fact, it is shorter than the

Magistrates Report & Recommendation. One of the clerks in the United States District of

Minnesota recently told plaintiff that about $1/3^{rd}$ of the complaints with attached exhibits filed

there are over 70 pages. Apparently the U.S. government frequently files 100 page complaints.

Writing criticisms are as old as law itself. Defendants always want fewer facts in record.

71.) Magistrate Schlatter stated in his 02-1950 R&R that plaintiffs did not cut out defendants and

claims when they squeezed their complaint into 40 pages, per his order, as he apparently hoped.

This was not his role. He had no right to deprive FAMILY of their due process in order to

convey immunity to the bar associations and various lawyers.

72.) Plaintiffs labored over their documents and everything they ever filed was filed for a

specific purpose, which was stated forthrightly. They bought a personal law library, subscribed

to an on-line service, and frequented the University of Wisconsin's famous law library, a federal

repository. FAMILY set their quotations off in single spaced, did all the tables of authorities

required, and cited legal authorities liberally.

73.) The rules of civil procedure allow plaintiffs to serve interrogatories with their complaint or any time after. The local rules also required conference on motions, including a motion to dismiss and a certificate of conference and various settlement conferences. The defense counsel refused to confer with FAMILY and refused to answer their interrogatories asked by email or letter or filed in court. This was not a case of FAMILY refusing to answer depositions because the case never got as far as a case management meeting. FAMLY told the magistrate, in written objections to motions, that the defense wouldn't confer with them out of court and the magistrate ordered that the defendants obligations to confer and respond to interrogatories out of court be ended, also that FAMILY could not petition government about the county judge's liberty injunction, the bogus criminal record etc. That injunction did not go though Rule 65 and couldn't go thru it because it would be unconstitutional. FAMILY objected to that and the magistrate simply ignored their objection.

74.) The ABA filed something they called a "motion to dismiss with prejudice". That is a non-existent legal form. If plaintiffs had filed an inadequate complaint against the ABA, they could have potentially remedied it, if told how it was inadequate. In fact, FAMILY filed very specific allegations tracing acts and omissions of the ABA to acts and omissions of various lawyers in Steamboat, which adversely affected the FAMILY. The ABA did not dispute one of them. In effect, by calling their motion to dismiss a "motion to dismiss with prejudice" the ABA filed a motion for summary judgment. Then however, they refused to label it correctly or allow the plaintiffs a hearing to dispute it. Also, a motion for summary judgment is required to have a statement of disputed facts, which the ABA did not supply.

75.) Plaintiffs' thought, and think, the ABA's motion to dismiss is completely ineffective legally.

The ABA was not able to cite any legal authority giving them immunity in tort from claims

against the public. The U.S. government, President Clinton, Attorney General Mitchell, and the

Catholic Church had to Answer, why shouldn't the ABA? The ABA claimed:

> "it is a fundamental tenet of the law that in order to sustain a cause of action against a
> particular defendant, a plaintiff must establish that his or her injuries were caused by a
> breach of legal duty owed to plaintiff by the defendant. In this case, plaintiffs cannot
> establish a legal duty owed to them by the ABA...The ABA is a private voluntary
> professional association....The ABA has no legal authority to impose or enforce
> standards of conduct on individual attorneys...while the ABA has promulgated its Model
> Rules of Professional Conduct as a guide for the legal profession, the ABA had no legal
> authority to mandate the adoption, use or enforcement of these or any other
> rules....Plaintiffs cannot establish a legal duty that might flow through the ABA to the
> plaintiffs based on those alleged ABA acts or omissions....there is no set of facts that
> would establish any control by the ABA over the defendant attorneys or that might
> establish any responsibility on the part of the ABA for the alleged attorney actions...."
> (02-1950 D. 130 filed by Patricia Jean Larson.

76.) It is not plaintiffs fault that the ABA filed such a stupid answer. They thought the ABA

would settle out of court and expected the ABA to be gracious and solicitous of them while

enraged about the various evidence of attorney misconduct they provided.

77.) Plaintiffs filed for partial summary judgment against the ABA. The ABA decided to

boycott the summary judgment process even though

> "As originally adopted, Rule 56(a) provided that a party seeking to recover upon a claim,
> counterclaim, or cross-claim or to obtain a declaratory judgment might move for a summary
> judgment at any time after a responsive pleading had been served. As a result, plaintiff could not
> seek summary judgment until after defendant had served an answer. This gave defendants a
> tactical advantage since they could move for summary judgment before answering, but plaintiffs
> could not pursue the same course until after the answer was served. In addition, a considerable
> period might pass before the responsive pleading was served if defendant interposed one or more
> preliminary motions or secured a stipulation extending the time to answer.
> The 1948 amendment changed Rule 46(a) to allow a claimant to move for summary
> judgment at any time after the expiration of 20 days from the commencement of the
> action....The Advisory Committee Note to the amendment states that this change was made "in
> the interest of more expeditious litigation" and that "the 20 day period...gives the defendant an

opportunity to secure counsel and determine a course of action." Wright and Miller Federal Procedure Chapter 8 section 2717 starting on page 26 "When a Summary Judgment Motion May be Made".

78.) Plaintiffs were assertive in their motions for summary judgment that they expected an answer to their summary judgment motions in the 20-day period. So the ABA filed a so called "letter motion in lieu of a formal motion" asking that the process be stayed until the case was dismissed and asking Judge Nottingham to relay messages about the procedure to be used through his clerk. This violated the rules of civil procedure, the rules of professional conduct, litigation conduct standards simultaneously published on the Internet by the ABA, Cannon III, and the Administrative Procedures Act. All the defense counsel knew about this and agreed with the boycott. The ABA and another defense counsel, Oliphant, who imitated the ABA in filing a letter motion also asking to have the summary judgment process suspended and the court to call him, referred to the "posture" in this case. FAMILY objected to any special posture and any deviation from the rules as written.

79.) The rule in the 10th Circuit is:

"a prevailing defendant in a 1983 action may recover attorney's fees only if the lawsuit was "'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1581 (10th Cir. 1995) (quoting Hughes v. Rowe, 449 U.S. 5, 14 (1980) (further quotation omitted)). This is a "stringent" standard, Figures v. Board of Pub. Utils., 967 F.2d 357, 362 (10th Cir. 1992), so that rarely is a suit so truly frivolous that a plaintiff is required to pay attorney's fees to the defendant, see Clajon, 70 F.3d at 1582. And the court may not award attorney's fees against counsel under Section(s) 1988. See Roadway Express, Inc. v. Piper, 447 U.S. 752, 761 (1980) (noting that Section(s) 1988 makes no mention of attorney liability for costs and fees)." Wagner v. Town of Gilcrest, 125 F.3d 864 (10th Cir. 10/08/1997)  125 F.3d 864, 1997.C10.1131

"A claim is frivolous if the proponent can present no **rational** argument based on the evidence or law in support of the claim." See Western United Realty, Inc. v. Isaacs, 679 P.2d 1063 (Colo. 1984).

80.) The Merriam-Webster Dictionary defines "rational" as having reason or understanding. All of plaintiffs' arguments had reason and understanding. They supported these claims by credible evidence, which was undisputed. They backed up the evidentiary statements in their complaint and motions by admissible government document evidence they had collected using the Freedom of Information Act and by reproducible photos.

81.) The Rules of Civil Procedure, **Rule 54(b)** requires that the party seeking attorney fees cite "the statute, rule or other grounds entitling the moving party to the award". However, the only authority cited by the defense was the same Magistrate Judge Schlatter, with whom they actively colluded. Rule 43 requires that such evidence by taken in open court but the Magistrate refused a hearing and instructed that plaintiffs could not contest the amounts of and basis of the fees. Rule 11 requires that a "motion for sanctions" "shall describe the specific conduct alleged to violate subdivision (b)". Defendants did not allege specific conduct by plaintiffs. If the Court wants to do this on its own initiative it is still required to describe the specific conduct and must allow the party to show cause why it did not violate the subdivision. In this case, the Court did not describe specific conduct by plaintiffs violating Rule 11 and ordered that plaintiffs could not contest the legal fees. Furthermore, the Court took action on the legal fees, against plaintiffs' objections, while the case was in appeal so as to increase the work burden on plaintiffs at a critical time.

82.) Faegre & Benson, defense counsel for the Steamboat Pilot & Today, specifically requested that thousands and thousands of dollars of fines on plaintiffs be awarded using the Court's "inherent powers" to "penalize" plaintiffs. The only case they use for justification, Olson v. Coleman, is a prisoner prison condition lawsuit and does not even mention legal fees. This same

firm had previously listed 20 cases about anti-trust law as defenses for failure to state a claim to plaintiffs' claims of civil conspiracy and aiding and abetting.

83.) The Magistrate lied in the first paragraph of his R&R saying "Ms. Sieverding alone spoke for the entire family", when both David Sieverding and Ed Sieverding spoke. He said "The primary plaintiff is Kay Sieverding" even though facts involving direct participation and facts involving direct damages were stated in their complaint. He lied when he wrote "The remaining members of the family are involved in the underlying events only in a collateral fashion". How would he characterize David Sieverdings' direct economic losses from events such as the defendant threatening to shoot a very interested buyer of plaintiffs' property? He was co-owner.

84.) The lies by the magistrate continue in the next paragraph "in 1991...Sieverding objected to the local authorities about Bennetts construction activities and what she perceived t be violations of the zoning laws...of course, Ms. Sieverding's complaints gave rise to tension between the two families." Actually in summer 1992, less than one year after Sieverdings moved across the street from Bennetts, Bennetts fenced off and barricaded the last 100 feet of a 60 foot wide road with fronting and road access to FAMILY'S home. The politician converted the road to private use by fences and threats. It wasn't until 1999 that the politician successfully extorted land from the FAMILY and then he didn't build on the land violating the development laws for volume, type, and location until 2000 after he got the title through the extortion. In between these two events, the politician repeatedly set off full sized aerial fireworks over FAMILY'S home in violation of national fire standards, defamed them, threatened them, had them be the only citizens required to get a "gardening permit", launched one of three malicious prosecutions, etc. So what happened in the year 2000 did not cause what happened in the year 1992. So right there

the magistrate subverted justice with the knowing approval and aid and for the benefit of the

defendants.

85.) The magistrate continues on page 2 "The differences between Ms. Sieverding and the

County developed when the deputy district attorneys for Routt County initiated prosecutions

against her for 'unlawful tree trimming' and harassment of Jane Bennett." Again, that is a total

misstatement of what happened. The district attorney's office was involved late in the game.

They did not institute charges against her for harassment of Jane Bennett. There was no

harassment of Jane Bennett by plaintiffs or Kay Sieverding. Jane Bennett signed the criminal

complaint as arresting officer with no police officer's signature. Plaintiffs saved the document

and gave a copy to the Court but Magistrate Schlatter sent it back. In any case, there was plenty

of documentation of these facts and no one disputed them.

86.) There was no 'unlawful tree trimming'. That was a trumped up charge in municipal court

based on municipal law. The tree was a big old hanging willow tree that was on the edge of

Sieverdings' driveway and the branches that were trimmed were small branches that were hitting

their cars. This was a common law right and customary county practice. In fact, the same week

the Bennetts trimmed the trees farther down the road and they were not prosecuted.

87.) Continuing in the same paragraph, the actions by the Bennetts were not "perceived crimes".

They were "real crimes" that FAMILY supported by comparing criminal statutes to the

undisputed facts. For instance, barricading and converting a road is a crime. Building in

violation of the development code is a crime. Reporting a false accusation of a crime is a crime

(False Reporting). Extortion is a felony.

88.) There is much additional undisputed evidence of extrinsic fraud on the Federal Court in the District of Colorado including that the case was litigated for 2 and 1/2 years without one statement of disputed facts by the defendants. In fact, in Feb and March 2005, after email conference, FAMILY filed almost identical motions in the District of Colorado, changing the names of the defendants, "**UNOPPOSED MOTION for Public Record, that in the 10th Circuit, (law firm) did not maintain any specific objection to entry of (name)'s joint and several liability to the Sieverding Family in the amount of $15 million plus 12% interest from 3/1/04**" (D. 517…D. 554) The end of this was simply the Magistrate's ordering plaintiffs not to file anything more. The defendants could have objected saying "there objection to entry of default is '_____'", but they didn't because they don't have a defense other than collusion to deny the vary nature of the judicial process..

89.) On 7/16/03 to 7/18/03, the claims agent for the local government public officials errors, omissions and crime insurance billed Lloyd's of London, a private organization unregulated in the United States' for:

"Review correspondence regarding district attorney information and proposed motion for summary judgment. Telephone call to (district attorney St. James regarding same…threatened motion for summary judgment etc." ( Brougham verified bill)

90.) The local rules said that conference was required on all motions. The Sieverdings tried to do everything according to the book so they conferred with the defense about their drafts of motions for summary judgment and faxed a draft. However, before they got it filed, the defense convinced the magistrate to close the pleadings, to plaintiffs only. The plaintiffs didn't know that motion was in the works because the defense did not confer with plaintiffs, violating local rules. The magistrate was not supposed to close the pleadings without a three-day public notice

but he skipped that and ruled the day the defense filed their motion to close the pleadings. He kept the pleadings open for the defendants however. The clerks did not docket plaintiffs' first motions for summary judgment. The defense counsel, however, received the summary judgment motions but did not oppose them or acknowledge them to Sieverdings except in their billing detail.

91.) Without stated reason other than Judge Matsch had enough cases of that type, the U.S. Judiciary switched presiding judges from Judge Matsch to Judge Nottingham in the middle of the case. The judge they switched to had previously ridiculed plaintiffs for a filing they paid $150 for to document a shooting threat of a potential buyer of their property by defendant Kevin Bennett they had received an email about a week earlier and obstruction of justice related to reporting that threat. Since that was a related action it was supposed to be also assigned to Judge Matsch. Plaintiffs motioned to go back to Judge Matsch but their motion was ignored. Judge Matsch continued to work and take new cases.

92.) Although Magistrate Schlatter asserted, without much detail or any evidence, that the Sieverdings had somehow acted improperly, the administrative investigatory agency of the Colorado Supreme Court found nothing warranting an injunction. The 02-1950 defense attorney David Brougham had turned in a complaint that Sieverding should be sanctioned for unauthorized practice of law. After the Colorado Attorney Regulation Counsel wrote back to Brougham that there was no basis to continue hearings against Sieverding, Brougham didn't argue or come up with more evidence.

93.) A verified bill from the city attorney Lettunich says:

**6/24/03 "Telephone call from Dave Brougham (defense attorney for government defendants) advising me that the Clerk for Magistrate Schlatter advised that no Reply would be necessary".**

This then, was not only ex parte contact against Canon III but also was evidence of collusion to dismiss without a reply. Furthermore the day before, on 6/23/03, defense attorney Brougham bills:

**"6/23/03 confer with Van Pelt regarding reply issues. Telephone call to Court regarding need for same".**

94.) In addition to the already discussed three records of solicited ex parte contact (letter from Oliphant, letter from Larson, and bill from Lettunich) the bills, which were submitted after Judge Nottingham's order to levy punitive fees include twenty six other bills for **"conference call to court to check on status of pending motions", "confer with clerks regarding case status, pending motions etc."**...(same day 12/11/03, 15 minutes more) **"further conference with court staff regarding motion status"**.... (1/7/04 24 minutes) **"Confer with court regarding number of plaintiffs pleadings, pending motions, etc. analyze motion to enjoin grounds etc."**

95.) The attorney bills discuss a letter and preparing a motion to enjoin plaintiffs from future litigation. Neither the letter nor the motion appears in the record in any place other than in the attorney bills and the magistrate's 7/31/04 letter and report and recommendation. When plaintiffs filed to get "two letters" referred to by the magistrate, he refused to produce them or process plaintiffs' motion.

96.) Defendants repeatedly misquoted cases. For instance, the defense attorney for the City said that Monell v. New York Department of Social Services bars claims against municipalities under

section 1983; in fact the Supreme Court case said that municipalities cannot themselves initiate

actions under section 1983.

"Brougham's reference was again made in bad faith, intending to confuse the plaintiffs and the judge. It is impossible that an attorney who has been involved in the types of cases that Brougham has does not understand this distinction or the significance of the Monell Supreme Court case.

As we discussed at the... conference on 1/30/03, the CITY made the discrimination against the Sieverdings and their property official policy when the CITY policy makers refused to investigate the failure of code enforcement regarding the Bennett's property, when CITY planning services director Wendie Schulenburg perjured herself and she and CITY manager Paul Hughes wrote deceitful letters to the Sieverdings claiming that Bennett's construction was within the code when it was in gross violation, when the CITY council and the CITY attorney refused to investigate the perjury and false government statements, when they passed legislation targeting the Sieverding's property without public purpose and not requested by unbiased professional planners etc.

One Court definition says "A municipality violates the Constitution when it has an unconstitutional custom or policy. Id. A "custom" or "policy" can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995). As quoted in(Brokaw v. Mercer County, 235 F.3d 1000, 235 F.3d 1000 (7th Cir. 12/19/200)

Weeks ago we wrote Brougham and asked him "what is the basis of your claims on page 9 -10 that members most of the public officials named in this suit had no personal participation in the events?" But there was no response. In fact, City Council President Kevin Bennett blockaded the road, built in violation of the laws and was there when requests were made to compare the laws to the construction. Cit Council member Kathy Connell specifically refused to compare the laws to the construction--that is on tape recording and knew about the perjury by Wendie Schulenburg but refused to investigate it. City council members Arianthe Stettner, Paul Strong, James Engleken, and Ken Brenner knew about the road blockade, the construction violations, and the perjury by Wendie Schulenburg but refused to investigate it even when personally and repeatedly asked. They all violated their oath of office. Public works director James Weber wrote a deceptive email saying that he had the power to regulate the number of driveways and refused to acknowledge that the CITY had a statutory obligation to provide a road terminus. Wendie Schulenburg perjured herself and also wrote a false government certificate, a class 6 felony, which she refused to correct even when she signed a memo a few months later, which directly contradicted it. She also refused to perform her job description. City manager Paul Hughes issued a letter he called a "gardening permit" to Kay Sieverding even though he never issued one to anyone else and the CITY provided no landscaping or trimming services in the areas between private property lines and the pavement, which average 18 feet wide. City manger Paul Hughes sent the police to press criminal charges against Kay Sieverding for the branch trimming knowing that he had never issued a branch trimming permit or branch trimming citation to anyone else but the trees were all over the area and Kay Sieverding brought

him photos showing where Bennetts, or their employees, had cut much larger branches off the same stand of trees, and even the same tree, also growing on land owned by the CITY. Paul Hughes issued a false government certificate when he wrote a letter in November 2001 saying that Bennett's construction was in complete compliance with all CITY laws in effect at the time when he knew that was untrue. Paul Hughes personally refused to investigate Wendie Schulenburg's perjury, Wendie Schulenburg's false government certificate (deceitful letter written on 7/13). How can you say that any of these officials lacked personal participation? (FAMILY'S objection to local government defendants' motion to dismiss and motion for summary judgment p. 55-56)

After FAMILY had supplied this additional detail, the Magistrate's Report and Recommendation said

"Virtually every defendant is charged by plaintiffs with being in conspiracy. Everybody is alleged to be in conspiracy with everyone else. However,...whether plaintiffs are attempting to state claims for conspiracy pursuant to...or...they have failed to state facts that would support their claims."

97.) A plaintiff isn't supposed to have to prove their prima facie case without discovery or answers to interrogatories just to survive a motion to dismiss.

98,) Another way that Magistrate Schlatter misquoted the record is that he wrote, on p. 35 of his R&R "However, plaintiffs have stated no facts in their complaints that would cause their claims to fall within the exceptions to the general rule, that is, claims against lawyers for conduct that is "fraudulent, malicious, or intentionally tortuous:". The effective complaint included very specific facts alleging fraudulent, malicious and intentionally tortuous behavior by lawyers employed directly by Kevin Bennett or beholden to him through his political powers as highest local boss. It was just a lie to say that the detailed allegations of fraudulent, malicious and intentionally tortuous behavior weren't in the complaint, because as the following shows they were, and even more evidentiary facts were included in FAMILY'S objections to the defendants motions to dismiss and FAMILY'S motions for partial summary judgment. From the effective complaint, the following facts were undisputed:

46

Undisputed  02—1950 facts: F 81 "From the mid 90s to the present, CITY attorney Anthony Lettunich failed to perform his city attorney duties in order to help politician Kevin Bennett violate local and state laws." F.87 "These four lawyers used deceit to help the Bennetts blockade the street, acquire the street for free, build more volume than allowed by law, and build a house in a location not allowed by law." F.88 "When the Sieverdings complained, the Bennetts, and their friends in local law enforcement stopped their complaints by twice criminally charging Mrs. Sieverding without a valid basis, used deceit to get a judge to say she was a credible threat to Jane Bennett, and claimed Kay Sieverding was a criminal and  threatened her with jail repeatedly for bogus charges." D.89 "District attorneys Wittemyer, McLimans,  Lance, and St. James and police management J.D.Hays and Art Fiebing knew that crimes were committed in the process of the Bennetts "stealing" property rights and stopping the Sieverdings from petitioning government but in their reckless indifference and in informal civil conspiracy they allowed crimes to go uninvestigated and unpunished so as to further their careers and improve their job security. F. 116 "On 11/5/1992, the Bennett's attorney, James B. F. Oliphant, wrote Kay Sieverding a deceitful letter claiming Bennett's street blockade was legal and threatening their home based business with government prosecution." F.121 "City attorneys…were obligated to open the (8 year) street blockade" F. 125 "City attorney Anthony Lettunich called Kay Sieverding in 1995 and said he could not stop the road blockade while Kevin Bennett was in local political office but that the blockade could be stopped after he left office". F. 151 "In April 1999, assistant city attorney, Daniel Foote, wrote deceitful materials justifying the discriminatory regulation." F. 152 "Following the issuing of a letter giving Sieverding permission to garden, the CITY manager, Paul Hughes, on 6/15/99 sent a police officer to deliver criminal charges against Kay Sieverding for minor trimming of a tree by her drive." F. 188 "Richard Tremaine, Bennetts' attorney, proclaimed that Sievererdings' driveway was a public facility" F. 197 "But the CITY actors acted deceitfully to escape their obligations to provide a road terminus and enforce the parking practices developed by the CITY council and State of Colorado. They used the criminal charges and implicit threat of libel by CITY actors to pressure the Sieverdings to sign a bogus contract for which they received no actual benefit". Fact 260 "Attorney Randall Klauzer knew before he asked Schulenburg (AKA Roonie) the questions about Bennetts' code compliance that if  Schulenburg told the truth it would hurt his client Jane Bennett by proving her ulterior motives". F. 261 "Randall Klauzer knew as soon as he heard Schulenburg's testimony that it was perjury." F. 263 "In (county) court on 9/6/00, Randall Klauzer libeled Kay Sieverding saying 'The fact of the matter is that the molestation (of Jane Bennett) is, as the evidence, quite frankly, is unrefuted, is expanding, increasing, becoming more violent, becoming more involved" (p 161, lines 20-22) "she (Kay Sieverding) has a mania...she was mania in the plural" (p. 162, lines 13-14)… "continue to abuse" (p 163) ." F. 274 "Randall Klauzer had no legitimate motivation or reason to make the preceding statements". F. 275 "Neither Jane Bennett nor her witnesses nor the two police officers testified on 9/6/00 that there was any violence, any sexual or physical contact at all, any threat of violence, any obscenities as legally defined, any threatening or obscene hand gestures,…"

99.) How much more specific can you get?  Plaintiffs even kept the letter from Oliphant with his

original signature. They also documented his unjust enrichment when he bought their home for

$100,000 less than appraised after Bennetts drove them from it.  If the defendants had wanted to say

the letter was forged or something, they could have listed it as a disputed fact and it could have been resolved through discovery.   They also documented the prosecutor's Wittemeyer financial interest benefited by Bennett including a Wall Street Journal advertisement placed by her husband. Could they have said that the commercial real estate broker listing the new ski resort wasn't really her husband?   But you can't just get the magistrate to say that the facts weren't pled.

100.) The court and the defense colluded to misquote the record.  For instance, FAMILY has claims against the local newspaper for civil conspiracy and aiding and abetting criminal conduct for publishing statements about MOTHER and the politician's construction and the law, that were untrue. The effective complaint says "**Fact 238 The newspaper published Schulenburg's deceitful statements although they knew they were false**". Following that the plaintiff provided more detail about conversations they had with, emails they sent to, documents they delivered to,  etc. At no point did the defendant dispute any of these facts.  Yet the magistrate's report and recommendation finds out of the blue that the plaintiffs did not allege malice.  As discussed below, the defense counsel then published that on the Internet.

101.) Another example of the Magistrate's misquoting the record is that on pages 35-36 he asserts that prosecutors have absolute immunity for "their conduct in the initiation and prosecution of criminal cases". Yet the defamation and tortuous actions that FAMILY claimed against prosecutor Wittemeyer took place after she dismissed the criminal charge against Sieverding.  The claims right in the effective complaint specify the dates and sequence of actions.  The Magistrate and the defense know full well that the U.S. Supreme Court specifically denied prosecutor's immunity for press conferences after a criminal complaint is dismissed.  Plaintiffs repeatedly quoted that case to them

and there is a similar one by the Supreme Court of New Mexico they also quoted. That's in the

Restatement of Torts and Dobbs The Law of Torts also.

Undisputed Facts. 312 "On 3/27/01, Wittemyer wrote deceitfully on a motion to dismiss 'Although probable cause exists, it would not be in the best social or economic interests of the public to persist in the prosecution of this case. The victim concurs in this decision.' This was deceit because there was no probable cause and no victim". Undisputed Facts 313 "As printed on 3-31-01, Wittemyer libeled Kay Sieverding by telling the newspaper there was probable cause to prosecute her for harassment. She implied Kay Sieverding was a criminal."

102.) Another example of Magistrate Schlatter's misrepresenting the record to the superior court is

his statement on page 37:

"To hold the City liable, plaintiffs must show not only that a constitutional violation occurred but also that some municipal policy...was the moving force behind the violation...The Sieverdings have alleged no facts that would tend to demonstrate the existence of a practice or policy by the city, and that a direct causal link between such custom or policy resulted in any violation of plaintiffs' rights. The failure to allege such facts is fatal to a claim against a municipality"

103.) Plaintiffs and the magistrate had discussed the legal requirements for a finding a official policy

in the 1/30/03 oral conference and plaintiff had informed the magistrate that she had been aware of

that legal principle at the time the events were occurring. Therefore she had repeatedly petitioned the

city council and city manager until they could not possibly claim that they did not know about the

events affecting her with the specific intention of either having the policies changed or having them

established as policies.

104.) As she told the magistrate, the defense attorney for the city Brougham, and the CBA, she had

repeatedly sent the city checks and asked them, as per a service they had published as being available

to local citizens, to compare the laws as written to the construction of the city council president so as

to prove the perjury and false government certificate of the city planning services director so that

Sieverding could prove the malicious motive for Jane Bennetts' liberty injunction on Sieverding and obtain various relief.

105.) The City manager sent back a letter that was a false government certificate in itself, a felony, that falsely claimed that Bennetts' construction complied with the applicable statutes and refused to have anyone associated with the city answer plaintiffs questions.  The city manager sent the letter to the city council and the city attorney.  Plaintiffs referred to the letter in their pleadings and submitted a certified copy to the court in D.42.

106.) After receiving the fraudulent letter from the city manager Hughes,  plaintiffs contacted the one certified city planner the city employed, Tim McHarg, and asked him to compare Bennett's construction to the laws.  She had previously developed and distributed a simple form she called "27 minutes to prove Schulenburg's perjury". McHarg and she had several phone conversations and emails.  However, McHarg told Sieverding that he was willing to officially answer plaintiffs' question but that the city manager and the city attorney had ordered him not to.  All of this was in the effective complaint in adequate detail and plaintiffs also supplied copies of their correspondence with the policy makers.  Both David and Kay Sieverding had also repeatedly addressed the city council on these matters and that was mostly tape recorded and plaintiffs had submitted to the court letters from the city clerk referring to the included certified tape recordings of the public meetings. As the 02-1950 record showed, plaintiffs had picketed the city council meeting and there is a photo of them in the meeting with their sign saying "Same Laws for All".  As is also in the 02-1950 record, plaintiffs have answer machine recordings left at their home by a city council member and tape recordings of informal conversations with various city officials.

107.) As is also in the 02-1950 record, plaintiffs had distributed annotated copies of Marbury v.

Madison, the Village of WillowBrook v. Olech, and 42 U.S.C. sections 1981 to 1985 to the city

officials at various public meetings, through email to their city emails, and by asking the city clerk to

put them in the city council package. So the magistrate lied again about the record and the evidence.

108.) Furthermore, the magistrate was obligated to reveal to his superiors that the plaintiffs had filed

a package (three copies docket 42 after the magistrate announced his intention to hold an unregulated

oral conference) of more than 750 pages of admissible evidence. That included the transcript of 5

hours of oral testimony related to the injunction in Routt County Court, letters from the defendants,

photos of the properties in question, city maps, and many documents certified by the Steamboat city

clerk. These documents supported most of the facts asserted by plaintiffs in their effective complaint.

The existence of the evidence package is important to understanding the procedural history of the

case and the magistrate did not have a right to suppress it.

109.) Also, the document evidence, plaintiffs written pleadings, and plaintiffs oral pleadings alleged

and proved criminal conduct on the part of the defenses. The magistrate chose not to recognize that

and pretended to his superiors that crime was not an issue in the case.

110.)Another way that the magistrate and the defense colluded to deny basic civil due process was to

allow a motion to dismiss to be entered for intentional torts and tortuous crimes. A supervising court

would therefore assume that there were no intentional torts or tortuous crimes. The supervising

court's innate presumption is that a professional judge is right and a pro se litigant is wrong. Then

they allow their busy schedule and natural aversion to controversy with their professional colleagues

to deny their obligations for an independent evaluation. The magistrate simply lied on page 37 when

he stated that the plaintiffs had failed to carry out their burden with respect to the C.G.I.A. That act

does not give immunity to government employees for intentional torts and crimes. Furthermore, the plaintiffs filed a very specific CGIA complaint in December of 2000, which they later updated. The Magistrate covered that up.

111.) The magistrate did not acknowledge that no immunity is provided under the CGIA for acts and omissions due to fraud or malice. Plaintiffs specifically pleaded both fraud and malice and constitutional violations. For instance, two separate instances of felony false government certificate in letters addressed to plaintiffs by name concerning their property rights and the city officials building in violation of the development laws 10 feet from their property and installing an illegally located driveway forcing public traffic into plaintiffs' own drive.

112.) Magistrate Schlatter said he "drinks with lawyers" and it sounded like defense lawyer Brougham was one of the regulars at a nearby establishment. (01/30/03 oral hearing)

113.) The magistrate also made regular nasty innuendos about FAMILY with no basis in fact and simply to pervert the legal process. In his R&R he left out some facts and records and lied about others.   For instance, Magistrate Schaller writes:

"Unfortunately, Ms. Sieverding has apparently allowed her obsession…to overcome her reason and judgment…"

The magistrate had no right to characterize the plaintiffs like this. If the defendants had contested plaintiffs amended $15 million plus 12% interest from 3/1/04" claim, which they did not, although they had opportunities), it would have been for a jury to decide how much the claims were worth not for the magistrate to dismiss the complaint as an "obsession". Furthermore the facts as pled included that the defendants interfered with the value of their land and cost them expenses, which they itemized as $400,000 (which was undisputed) (there were also personal injury claims and punitive). According to the U.S. Judiciary web site, many

magistrate judges are making less than $40,000 per annum.  So **$400,000 might be more than ten years of a magistrate judge's pre tax income.  It seems likely that Magistrate Schlatter might feel a little "obsessive" if he was out $400,000.**  The personal damages were, and are, also very substantial and ongoing.   It was a total subversion of legal process to pretend that $400,000 in documented economic losses and multiple malicious prosecutions and defamations published on the Internet and being threatened, forced to move, losing their home in more ways than one are just an "obsession".  Furthermore, "normal" behavior is to defend a family name with many citizens pursuing actions to correct dishonorable military discharges after their fathers are already dead, for instance.

114.) The magistrate wrote that FAMILY's 18,681-word 12th grade level complaint was "prolix, verbose, rambling and incoherent…"

Microsoft word ranks the FAMLY'S complaint as within the preferred norm for legal writing. Notice pleading says that if there is a failure to communicate, clarification must be requested.  Also, such clarification and communications are to be done expeditiously at various oral hearings and out of court conferences and interrogatories.  The filings that the Magistrate said were incomprehensible were comparable in writing style to this one.

115.) The magistrate convened a required oral mini trial on 1/30/03 before any responsive pleadings were filed. According to the pro se handbook published by the U.S. Court District of Northern California, a status conference is a conference held after a case management plan meeting.

116.)  That 1/30/03 forum, which plaintiffs objected to, was a violation of the suggestions of the Judicial AntiCorruption Program for the Study of Democracy in Bulgaria:

a compulsory exchange of memoranda ...required before an open hearing is scheduled...before the parties appear in the courtroom for an open hearing, they will have disclosed all their possible allegations and evidence." Judicial AntiCorruption Program p 70 Center for the Study of Democracy (Bulgaria).

How can the U.S. Judiciary, or the ABA, or the CBA, or the various licensed attorneys appearing in 02-1950 declare that plaintiffs shouldn't have the same litigation due process rights as they recommend for citizens of Bulgaria?

117.) Because the defendants refused to acknowledge that they could not dispute the plaintiffs' well-researched facts, FAMILY had to repeat them in varying level of detail. That resulted in more written pages. It was not FAMILY'S fault that the only judicial tool not taken from them by judicial/defense collusion was written motion practice.

118.) Before embarking on their litigation, FAMILY had purchased "Preparing for Trial in Federal Court" from James Publishing. The process in 02-1950 was so strange that it was very difficult to match up with the chapters from that or any other procedure book. However, they did find and follow the chapter called "Alternatives to Proof" which basically said to build the case with declarations they don't controvert.

119.) The Magistrate wrote:

> nothing to bring any coherence or intelligibility to the contents of their allegations and complaint ...any effort by any reasonable person to wade through plaintiffs' complaint" (which was shorter than the Magistrates R&R) "and all of their claims is a mind-numbing exercise.,....Describing each of the individual defendants, and all of the claims that are asserted against each one of them, would be interminable and extraordinarily difficult. In the circumstances presented by this case, such an effort is unnecessary...

> "....The claims against the Bennetts read like the table of contents for a hornbook on torts. Virtually every tort imaginable has been listed...**and nothing would be served by listing those torts here....**"

54

120.) Why wouldn't the purposes of justice be served by listing the torts? Why is it a magistrate's right to decide that nothing would be served by telling the upper court what the claims were? Why is a 19,000 word plain language complaint written in sequentially numbered paragraphs at a 12th grade level, the target grade level for legal documents, too 'mind-numbing' for a judge to 'wade through'?

121.) The Magistrate Judge made unfounded conclusory statements such as "plaintiffs are not an insured of CIRSA." Actually CIRSA-- Colorado Intergovernmental Risk Sharing Association is a public agency operating with taxpayer dollars from which the City purchased public officials errors, omissions and employee crime insurance. FAMILY submitted a motion for partial summary judgment that they were among the insured and the defendants simply didn't respond. Yet, the upper court relies on the Magistrate for this conclusion based on his and the defenses wishful thinking.)

122.) As the Court knows, plaintiffs are allowed to serve interrogatories at any point and response is supposed to be made within 30 days. The magistrate issued strange orders that there should be no communication outside of court so that FAMILY couldn't get a response to their interrogatories and when they filed two as separate motions in July 2003, the magistrate responded by closing the pleadings to plaintiffs, while keeping them open to defendants.

123.) All of the procedures involving summary judgment in 02-1950 were mishandled. The City defendants filed a "motion for summary judgment" but, in it, did not did not include disputed facts. The ABA filed a "motion to dismiss with prejudice" that was essentially in intent a motion for summary judgment but it also did not include a statement of disputed facts. When MOTHER talked on the phone with ABA counsel Patricia Larson about summary judgment she pretended

the ABA had not filed for summary judgment. Larson wrote to Judge Nottingham mocking plaintiffs for not understanding the procedure. Larson called David Sieverding and told him his family's hard work in the litigation was just a waste that could have no benefit for them. Larson was required to tell the plaintiffs that she had filed for summary judgment and therefore they were entitled to an oral hearing and discovery and not to disguise it by calling the action a motion to dismiss with prejudice.

124.). When the magistrate reopened the pleadings FAMILY immediately filed for partial summary judgment in a series of motions involving specific claims on all the defendants and establishing their damages. None of the defendants responded with a statement of disputed facts. The Court tried to pretend that plaintiffs didn't file the motions for partial summary judgment and follow them up with default motions. This was collusion to prevent plaintiffs' document evidence and evidence from depositions and interrogatories from getting into the record.

125.) The district court eventually dismissed the case and the Sieverdings appealed it to the 10th Circuit. However, it was difficult to convey the information herein because

   a.) Sieverdings knew less about procedure then than they know now

   b.) Procedural motions are not allowed in the record on appeal and plaintiffs' motion to supplement the record was denied

   c.) The billing evidence was filed after the case was dismissed and so it wasn't part of the record on appeal.

   d.) Mr. Brougham the defense counsel for the government employees said that Sieverding could not use the billing information in the Court of Appeals d.) Because they were pro se, the plaintiffs were denied use of an appendix in the appeal

e.)  The defendants refused to confer with plaintiffs during the appeal although that was
supposed to be a part of the process

f.)  The defendants refused to respond to plaintiffs' supplemental motion.

g.)  The plaintiffs had counted on being able to reinforce their message with their Reply brief
but the 10th Circuit refused to read their Reply brief and also refused the same
information when inserted into a motion for rehearing.

h.)  There is basically no way to tell what the 10th Circuit knows or what it meant. The only
document they mention reading is the magistrate's report and recommendation although
the effective complaint is shorter, it sounds like they didn't get it. There was no ECF
pleading and there was only one copy of the paper record which apparently was put on
the "heavyweight shelf"

i.)  In their consolidated response brief, the defense counsel misrepresented the facts and the
record, for instance. claiming that the criminal charges against Sieverding had originated
with the district attorneys office when they actually originated with Jane Bennett and the
assistant city attorney (under home rule through municipal court), not admitting that the
Bennetts construction grossly violated the city zoning and development laws, and not
admitting that Sieverding was innocent of criminal conduct.

j.)  The defense claimed that they could not understand Plaintiffs' brief, although they
refused to say what sentence(s) they didn't understand.

k.)  There is no remedy in appellate procedure for misrepresenting the facts in a responsive
brief other than restating them in the Reply brief, which was not accepted in this case.
Plaintiffs didn't know that the 10th Circuit would refuse to read their reply brief because it

was too long and also to accept a shorter reply brief because the clerks had told the

plaintiffs they never heard of the court refusing to accept a shorter substitute reply brief if

they wouldn't take the longer one.  Plaintiffs had paid for three appeals and three reply

briefs in order to get "enough words" because they wanted to go all the way and get the

summary judgment in the sum certain amount.  The rules did not say they couldn't have

three opening briefs and three closing briefs, they consulted with the clerk before

deciding on the three brief strategy, they paid for all three, and all three of their checks

were accepted.

l.)  Plaintiffs consulted West Federal Digest Lawyer's Edition,  Moore's Federal Procedure

and  Wright and Miller publications and still couldn't figure out any way other than this

and re-litigation to cope effectively with the complete breakdown of due process.

126.) The Sieverdings became very suspicious because the defense refused to consult with them,

make them a settlement offer, or state why they thought they weren't liable.

in several different forums filed:

"Motion that the 10th Circuit invite the Department of Justice Public Integrity Section
Criminal Division to investigate Magistrate Schlatter, Judge Nottingham, and the defense
counsel for criminal activities in the course of 02-1950 litigation.... Plaintiffs believe that the
following crimes were committed by the defense and the judges with corrupt motive in the
course of 02-1950:  obstruction of justice, abuse of trust, misprision of felony, false government
certificate, accessory after the fact, fraud, denial of insurance, deprivation of honest services,
criminal deprivation of litigation rights, and 18 U.S.C. S 3553(b)(1994) (misc. crimes stat.)."  In
none of those forums were any defenses or denials filed by the 02-1950 defense counsel nor by
Magistrate Schlatter although they all had opportunity.

127.) As discussed all the orders, judgments, and injunctions on plaintiffs resulting from 02-1950

meet the five essential elements for relief under Rule 60 (b)(3).

a.) All 02-1950 judgments should not in equity and good conscience, be enforced on the Sieverding Family because they were issued without Rule 65 or Rule 11 process, without statutory authority, without a statement of irreparable harm to defendants, and because they interfere with plaintiffs' fundamental rights. In fact, they were all a form of First Amendment Retaliation asserted by Magistrate Schlatter in an unethical resistance to establishing reasonable Right to Sue Rights and for the unethical reason of pretending that lawyers and groups of lawyers in bar associations have no duty to the public and no duty to third parties.

b.) The judgments were founded without specific statement of an alleged cause of action. The Court stated that plaintiffs' filings were frivolous but did not accurately point out which specific point was supposed to be frivolous. The defendants did not contest any of the facts, declarations, or affidavits supplied by plaintiffs. Any references to plaintiffs' misconduct were simply innuendo without support. The worst thing plaintiffs did is include "long and flowery Supreme Court quotations" in their pleadings in an effort to get the Court to take them more seriously. Use of long Supreme Court and Law Library quotations is not sanctionable. Neither is using Light Garamond Condensed Type to squeeze 18,000 words into 40 pages.

c.) There was fraud, accident, or mistake in the judgment, which resulted in the Sieverding Family being prevented from obtaining the benefit of their defense. Not only did the Sieverding Family not get the benefit of their defense, they didn't get the benefit of their "offense". That is because the defense and the court colluded to suspend the normal process by which lawsuits are conducted so that there wouldn't be a statement of disputed facts nor stipulations as to undisputed facts.

d.) There was an absence of fault or negligence on the part of the Sieverding Family. They took the litigation and their research results seriously and filed coherent well-researched briefs and declarations under penalty of perjury. What else could they have done?

f.) There is an absence of any adequate remedy at law. Going to the Supreme Court sounds exciting but you are not guaranteed a hearing and any hearing granted is not timely. In the meantime, the 02-1950 Magistrate and the defendants want to bankrupt the plaintiffs through civil fines, stop the proper litigation of plaintiffs' claims through "filing restrictions" and jail the plaintiffs for criminal contempt for going to court for redress of their grievances.

**III.) Plaintiffs apply herein for legal assistance under the Equal Access to Justice Act.**

128.) Relief is required because of the ex parte collusion in 02-1950 and the obstruction of justice in 04-4317, which plaintiffs are appealing.

129.) 04-4317, Sieverding v. Feagre & Benson et al., was filed in the District of Minnesota in October of 2004. That action concerned the same equitable Rule 65 action, prohibition of publication of the same articles as is requested below. The defendants, The World Company AKA WorldWest and Steamboat Pilot and their attorneys Feagre & Benson published the same publications as discussed below in a new period of time, 3/23/04 to 5/23/05. As a result of the publications, plaintiffs suffered additional damages during that time, as detailed in the complaint. So that action was also a tort damages action, in addition to an action in equity.

130.) The current status of 04-4317 is that plaintiff is planning to file a notice of appeal close to the deadline to give themselves more time for that appeal. The judge, Judge Tunheim, imposed a right to file restriction (no filing without finding, and paying, a lawyer who makes all the decisions and does all the work). That injunction also did not go through Rule 65; there was no

formal motion, no statutory authority, no statement of irreparable harm, no evidentiary hearing, etc.

131.)The dismissal of 04-4317 also involved a denial of plaintiffs motion for summary judgment in the undisputed amount of $3 million. Plaintiffs believe they have everything needed in the record so that the Court of Appeals will be required to award them the funds. They spent a lot of time researching legal authorities and documenting their facts. They don't want to start over again on 04-4317 with or without a lawyer. Whether or not they get the EAJ assistance they will complete the 04-4317 appeals process. They will include that injunction about pro se litigation in that appeal because it applies only to that action and that seems like a more natural and simpler way to separate the actions.

132.)Some reasons why Sieverdings have a right to free assistance under EAJ for their appeal of 04-4317:

    a.) The District of Minnesota superimposed an oral hearing for an injunction before the defense filed a written reply.

    b.) The Court showed its malice by allowing a Rule 65 motion by defense without the required forms, procedure, verified complaint, filing of counterclaim, showing of irreparable harm, citing of authority etc.

    c.) The Court convened the oral hearing in response to a paper "letter" although ECF filing is required for lawyers and action by letter is not in the rules.

    d.) At the oral hearing, counsel Patricia Sprain lied to Minnesota Magistrate Noel about the record of 02-1950, not admitting that they had filed in Colorado to have plaintiffs held in contempt of court. Following the hearing she lied in an email to Magistrate Noel and

said that plaintiffs had not filed an objection to their contempt motion, which of course plaintiffs had.

e.) Plaintiffs complained about Ms. Sprain's lying but the court did not censure her.

f.) Then defense counsel John Borger fled a paper letter asking Judge Tunheim to call him to discuss the case.

g.) Plaintiffs asked Judge Tunheim whether he had ex parte contact but he didn't answer.

h.) Defendants filed in violation of Rule 11. They filed as an affidavit a filing by Chris Beall, who represented The World Company AKA in 02-1950 which misquoted the order of Magistrate Schlatter as applying to related events, substituting the word "related" for the words "based on".

i.) Although the principles of equitable law require an independent judicial evaluation, defendants used the same R&R by Magistrate Schlatter as discussed above as a defense to the new action for new events and new damages. They asked the Court to rely on Magistrate Schlatter's statements of fact even though they knew his statements of fact were lies.

j.) The Court kept the action open for 7 months without a defense written reply according to the rules of procedure so as to put the plaintiffs in a disadvantageous position in related litigation.

k.) This six month delay was even though the oral defense stated by Patricia Sprain and ratified by Jon Borger and Eric Jorstadt, that the single publication rule excuses intentional continuing defamation over the Internet, was clearly inadequate and plaintiffs supplied sufficient legal authorities to controvert that.

l.) The 77 page complaint in 04-4317 was within Rule 8 standards. No motions for

clarification or summarization were filed.

m.) The judge filled up his dismissal with extraneous criticisms of plaintiffs in attempt to

confuse the court of appeals. For instance, he discussed the plaintiffs' choice of font size

in one filing in 02-1950.

n.) The defense strategy in 04-4317 was clearly avoidance and boycott and the Court

allowed it.

o.) The District of Minnesota local rule 83 prohibits litigation participants from publishing

about litigation while it is pending. The defense did that and did it in a misleading and

inaccurate way. The Court knew it and allowed it.


133.) It has been really a lot of work for plaintiffs to study the ins and outs of procedure, and to

document its abuses in 02-1950 and 04-4317.  Every document such as the undisputed "(First

Corrected) Motion that the 10th Circuit invite the Department of Justice Public Integrity Section

Criminal Division to investigate Magistrate Schlatter, Judge Nottingham, and the defense

counsel for criminal activities in the course of 02-1950 litigation" was real work when plaintiffs

could have been pursuing normal life. The extra work was caused by unauthorized rule making

and that is why the EAJ mandates some free help for plaintiffs.

134.) One big problem for plaintiffs is that the Court through this action apparently thought that

they could discount everything plaintiffs file because they are pro se. It is justice with a wink

and is no different than the equal rights deprived some citizens before Rosa Parks "drew the line"

and "took a stand" that she wished someone else had previously taken. There is no legal basis to

boycott the normal litigation process because one of the participants is pro se. Furthermore, the U.S. Supreme Court observed that broke prisoners can make meaningful contributions in law. If a broke prisoner with a small law library can file a legally significant brief, why wouldn't a solvent MIT graduate with access to the U. of Wisconsin law library be able to do even better?

135.) If a judge has ex parte conduct he is acting in violation of the Administrative Procedures Act. If he decides to suspend the published rules, he is engaging in unauthorized rule making in violation of the APA. Either should entitle the aggrieved citizen to free legal assistance under the EAJ. Why should the U.S. Judiciary be afraid?

136.) Plaintiffs first applied for assistance under the Equal Access for Justice Act in June 2004 by filing in the 10th Circuit. No one directed them to refile in a different forum. Their filing was ignored and declared moot.

137.) Previous to filing their motion for legal assistance under EAJA, Kay Sieverding conferred by email with ABA counsel Patricia Larson. Patricia Larson said that the EAJA and APA did not apply in litigation. Sieverding said they did because a decision to change the rules was an administrative decision. Larson said the organization had to be an administrative agency. Sieverding responded that the web site for federal rulemaking identified itself as an administrative agency.

**IV.) Plaintiffs apply under Rule 65 to enjoin the defendants from publishing the following articles and statements on the Internet: 1.) "Cost to Public Not Worth Pursuit" 2.) "Restraining Order Issued Against Sieverding" 3.) "Woman in Harassment Case Gets Trial" 4.) "Sieverding responds to Recommendations" and 5.) "Sieverding v. Steamboat**

Pilot. U.S. District Court – Colorado. Obtained dismissal on statute of limitation and First Amendment/actual malice grounds (2003)".

138.) Sieverding just checked the Internet on June 20, 2005 around 8 p.m. and all of the publications are up on the Internet except for the first one. Numbers 2 to 4 are published on a commercial web site originating in Lawrence Kansas at the World Company address above and are surrounded by advertisements. Number 5 is published on an advertisement for the defense attorney Faegre & Benson.

139.) Number 5 shouldn't be published because there is no constitutional right to publish falsities. The case was dismissed because of judicial defense collusion and misconduct. The defamatory publications were within two years of the claim and alleged special damages. The defamation claim included collusion with government actors who advertised in the Newspaper and with whom there was a specific agreement to publish known falsities. One of the articles containing known falsities as a form of fraud and civil conspiracy was only two months before the complaint was filed. Other articles publishing falsities as part of a civil conspiracy can be prosecuted as fraud within Colorado's three year period for fraud. As discussed above, the plaintiffs did allege and document actual malice in the publications. In publication about a still active case, the defense counsel violates legal ethics and attempts to obstruct justice. The declarations by the defense counsel come up when one "Google's" "Sieverding & Steamboat". The defendants know that the advertisement is there and that plaintiffs think it is misleading and objectionable and refuse to voluntarily remove it.

140.) Number 4 shouldn't be published because there is no  constitutional right to publish falsities. The article says "In addition to recommending dismissal of all claims, Schlatter

recommended that the plaintiffs be ordered to pay attorney fees and costs for the defendants".

That implied that Sieverdings filed fraudulently or frivolously or violated Rule 11 or boycotted

the process by not showing up or not answering when required. That was not true. Sieverdings

did nothing wrong. The article continues "Sieverding has filed numerous motions for summary

judgment or other relief...Schlatter issued a new order Friday recommending that these motions

be stricken from the case because they do not conform to the rules for filing an objection to

Schlatter's recommendation." As the Court knows, motions for summary judgment cannot be

legally "stricken" from the record because they "do not conform to the rules for filing an

objection".

141.) Numbers 1 to 3 shouldn't be published because there is no constitutional right to publish

falsities. All three say that Bennetts' construction complied with the development laws when

they know that it was grossly out of construction. All the articles say that Sieverding accused the

Bennetts of violating the development laws and imply that she was stupid, wrong, or stubborn,

when not only was she right but she was directly affected as the construction was only 10 feet

from their home. All three articles accuse Kay Sieverding of criminally harassing and abusing

Jane Bennett. Sieverding has a right to a presumption of innocence; therefore since she was not

found guilty and did not confess, the articles are fraudulent in saying that she engaged in

criminal, dangerous and immoral conduct.

142.) The Sieverding family is irreparably damaged every day the 5 publications are published.

Damages are presumed in defamation per se because they always occur. Plaintiffs' business and

social relationships are hurt, opportunities are lost, their self-confidence is undermined, and they

are at great risk from further publications.

143.) The Federal Court District of Columbia has jurisdiction under diversity of citizenship under section 1983 and 1985, because the publications are also broadcast in the District of Columbia where Sieverding was previously offered a responsible professional employment position with the U.S. Government and has friends and contacts from graduate school, and because plaintiffs also seek relief in this action of more than $75,000. Federal jurisdiction is based on 4th, 5th, 8th, 9th, 10th amendments and the Constitutions and Laws of Kansas, Wisconsin and Colorado.

144.) This case arises because of violation of the civil or equal rights privileges or immunities accorded to citizens of the United States based on **British common law as ratified by the U.S. Supreme Court**, **"natural law due process"** notion by which the U.S. Supreme Court which, as discussed by Chief Justice Burger, freed itself from the limits of a written Constitution and sets itself from the limits of a written Constitution and sets itself loose to declare any law unconstitutional that … deprives a person of "fundamental fairness," or violates the principles "implicit in the concept of ordered liberty". Plaintiffs also rely on recent international codification, adoption, and successful use of principles from British and American law and from natural law-- the **United Nations International Covenant on Civil and Political Rights** specifically:

145.) "Art 9 1 No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law…2 Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him… Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation… All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person. 12 Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement… The above-mentioned rights shall not be subject to any restrictions except those, which are provided by law, are necessary to protect national security, public order (ordre public), public health or morals or the rights and freedoms of others, and are consistent with the other rights

recognized in the present Covenant. 14 In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. **The press** and the public **may be excluded** from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or **when the interest of the private lives of the parties so requires**, or to the extent strictly necessary in the opinion of the court in special circumstances **where publicity would prejudice the interests of justice**... **Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law**.... To be tried in his presence, and to defend himself in person... When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him... **No one shall be liable to be tried or punished again for an offence for which he has already been** finally convicted or **acquitted** in accordance with the law and penal procedure of each country...15 **No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence**, under national or international law.... Everyone shall have the right to recognition everywhere as a person before the law....17.... **No one shall be subjected to arbitrary or unlawful interference with his privacy**, family, home or correspondence, **nor to unlawful attacks on his honour and reputation... Everyone has the right to the protection of the law against such interference or attacks**...26... All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as ....political or other opinions International Covenant on Civil and Political Rights... entry into force 23 March 1976, in accordance with Article 49....Office of the High Commission for Human Rights United Nations.

146.) 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to ...suit in equity, or other proper proceeding for redress" U.S.C.42 section 1983.

147.) "Obstructing justice; intimidating party... If two or more persons ...conspire to deter, by force, intimidation, obstruction, or threat, any party ....in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party ... in his person or ....to influence the verdict, presentment,...in any such court, or to injure such juror in his person or property on account of any verdict, presentment, ....lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or

attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws" U.S.C. section 1985.

148.) Based on common and natural laws, which are still in effect in 2005, the U.S. Supreme

Court found that defamation of private citizens unrelated to public issues is allowed injunctive

relief:

"Conceding arguendo that the "liberty" protected by the Fourteenth Amendment includes the liberty of speech and of the press…the term does not include the unrestricted right to publish everything. The guaranty is not absolute.…**The courts have power to restrain by injunction the publication of defamatory matter.** Gompers v. Bucks Stove & Range Co., 221 U.S. 418; Toledo Newspaper Co. v. United States, 247 U.S. 402…the evil which the Act seeks to suppress is a nuisance in fact. 3 Blackstone's Comm., c. 13, p. 216; 20 R. C. L. 384, § 7; Vegelahn v. Gunther, 167 Mass. 92; Sherry v. Perkins, 147 Mass. 212; Rhodes v. Dunbar, 57 Pa. St. 274; Oehler v. Levy, 234 Ill. 595; Wood on Nuisances, 3d ed., Vol. 1, p. 92, § 70; 20 R. C. L. 428; Davis v. Sawyer, 133 Mass. 289; State v. Graham, 3 Sneed 134; Commonwealth v. Oaks, 113 Mass. 8; Tanner v. Trustees, 5 Hill 121; Regina v. Foxby, 6 Mod. 213; Commonwealth v. Mohn, 52 Pa. St. 243; Mohr v. Gault, 10 Wis. 513; Gifford v. Hulett, 62 Vt. 342; State v. Diamant, 73 N. J. L. 131; New Jersey v. Martin, 77 N. J. L. 652; State v. Guilford, 174 Minn. 457; Eilenbecker v. District Court, 134 U.S. 31; Munn v. Illinois, 94 U.S. 114; Booth v. Illinois, 184 U.S. 425, 431; Bonnard v. Perryman (1891), LXV Law Times (N. S.) 506; 18 Halsbury's Laws of England, 733.…It is well known, as found by the state supreme court, that existing libel laws are inadequate effectively to suppress evils resulting from the kind of business and publications that are shown in this case. The doctrine that measures such as the one before us are invalid because they operate as previous restraints to infringe freedom of press exposes the peace and good order of every community and the business and **private affairs of every individual to the constant and protracted false and malicious assaults** of any .… publisher who may **have purpose and sufficient capacity to contrive and put into effect a scheme or program for oppression, blackmail or extortion.**" Near v. Minnesota ex rel. Olson 51 S. Ct. 625, 283 U.S. 697 (U.S. 06/01/31)

149.) "Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it **entirely proper for the State to act .…for the protection of the individual injured**" Gazette Inc. v. Harris, 325 S.E.2d 713, 229 Va. 1 (Va. 02/01/1985)

150.) "Courts in the vast majority of states have held that **fair comment [a form of opinion] is privileged only if it is based upon facts "truly stated."**.… The rule finds justification in the view that, if the facts are stated, the reader is able to judge for himself whether the comment is well founded.… the Second Circuit in Cianci v. New Times Pub. Co., 639 F.2d 54 (2d. Cir. 1980). The appellate court there held that **a statement which reasonably could only be understood as a charge imputing criminal or other wrongful acts is not constitutionally**

69

**protected or privileged, even when there is no reliance on undisclosed facts, if the published opinion "conveys false representations of defamatory [underlying] facts."** 639 F.2d at 65. Cianci strongly implies that only the truth of a charge of criminal activity which rests on misstatements or misrepresentations of disclosed "facts" is a defense to such a statement....when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. **If an author represents that he has private, first-hand knowledge, which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact....In** Cianci v. New York Times Pub. Co., 639 F.2d 54, 62 (2nd Cir. 1980), the court pointed out that in the Greenbelt case, supra, the Supreme Court communicated "[t]he clear implication... that if an accusation of actual criminal wrongdoing had been conveyed... [the accusation] would have been held actionable, unless within a privilege of fair reportage of public proceedings."... Kutz v. Independent Publishing Co., (12/08/1981) New Mexico Court of Appeals

151.) **An imputation of crime is defamatory per se.** Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975)

152.) C.R.S. 24-72-307  Challenge to accuracy and completeness – appeals."

"(1) Any person in interest who is provided access to any criminal justice records pursuant to this part 3 shall have the right to challenge the accuracy and completeness of records to which he has been given access, insofar as they pertain to him, and to request that said records be corrected.

(2) If the custodian refuses to make the requested correction, the person in interest may request a written statement of the grounds for the refusal, which statement shall be furnished forthwith.

(3) In the event that the custodian requires additional time to evaluate the merit of the request for correction, he shall so notify the applicant in writing forthwith. The custodian shall then have thirty days from the date of his receipt of the request for correction to evaluate the request and to make a determination of whether to grant or refuse the request, in whole or in part, which determination shall be forthwith communicated to the applicant in writing.

(4) Any person in interest whose request for correction of records is refused may apply to the district court of the district wherein the record is found for an order directing the custodian of such record to show cause why he should not permit the correction of such record. A hearing on such application shall be held at the earliest practical time. Unless the court finds that the refusal of correction was proper, it shall order the custodian to make such correction, and, upon a finding that the refusal was arbitrary or capricious, it may order the criminal justice agency for which the custodian was acting to pay the applicant's court costs and attorney fees in an amount to be determined by the court."

153.) The provisions of Rule 65 to get a restraining order against these defendants publishing these five articles or representations are met. There are no special forms in the District of Columbia.

154.) Proposed orders for the I.) Rule 60(b)(3) Relief from Judgment from Bennett v. Sieverding II.) Rule 60(b)(3) Relief from and modification of Judgment from Sieverding v. CBA, III.) Order for free of charge legal assistance under the Equal Access for Justice Act, and IV.) Rule 65 permanent restraining order-prohibiting defendants' continued publication of the five offensive publications:

 a.) The U.S. Court for the District of Columbia Court finds that the liberty injunction against

   Kay Sieverding issued in Routt County Court Bennett. v. Sieverding in 00cv008 is void.

 b.) The U.S. Court for the District of Columbia finds that

    (i)  There are no valid litigation restrictions on the Sieverding

       family stemming from 02-1950 Sieverding v. CBA.

       Sieverding may not be jailed for contempt of court for

       petitioning government through the courts. U.S. federal and

       state courts cannot insert extra steps or barriers to Sieverdings'

       future litigation based on the report and recommendation from

       Magistrate Schlatter.

    (ii)  The Court, the defense counsel, and the defendants may not

       claim any claims preclusive, equitable estoppels, or res judicata

       effect from Sieverding v. CBA 02-1950. That judgment was

       not based on the merits.

71

(iii)    The Sieverdings are not to be fined, made to pay legal fees, or

otherwise punished for their 02-1950 litigation.

c.) The U.S. Judiciary must make services of free legal assistance available to the

Sieverdings under the Equal Access to Justice Act

d.)  Faegre & Benson LLP  and The World Company AKA World West LLC and the

Steamboat Pilot Today are prohibited from further publication of "Sieverding v.

Steamboat Pilot. U.S. District Court – Colorado.  Obtained dismissal on statute of

limitation and First Amendment/actual malice grounds" and the articles entitled  i.) "Cost

to Public Not Worth Pursuit" ii.) "Restraining Order Issued Against Sieverding" iii.)

"Woman in Harassment Case Gets Trial" iv.) "Sieverding Responds to

Recommendations".  The articles and statement are not to be republished in paper form

nor rebroadcast on the Internet and must be deleted from Faegre and Benson LLC,  the

Steamboat Pilot/ WorldWest LLC and The World Company web sites and advertising.

Plaintiffs declare under penalty of perjury that the foregoing is true and correct under penalty of

perjury that the foregoing is true and correct.  Executed on June 22, 2005.

S./                                          S./

David Sieverding                      Kay Sieverding

641 Basswood Ave.. Verona, WI 53593 Voice, 608 848 5721, Fax 608 845 3201

Sieverding.kay@slides.com