

707 Seventeenth Street
Suite 2700
Denver, CO 80202

*Attachment to Sieverdings objection to delay*

### Independent Auditors' Report

The Board of Directors
Colorado Intergovernmental Risk Sharing Agency:

We have audited the accompanying combined statutory statements of admitted assets, liabilities, and surplus of the Colorado Intergovernmental Risk Sharing Agency (the Agency) as of December 31, 2002 and 2001, and the related combined statutory statements of loss, surplus, and cash flow for the years then ended. These combined statutory financial statements are the responsibility of the Agency's management. Our responsibility is to express an opinion on these combined statutory financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described more fully in note 1 to the financial statements, these financial statements were prepared in conformity with accounting practices prescribed or permitted by the Division of Insurance of the State of Colorado, which is a comprehensive basis of accounting other than accounting principles generally accepted in the United States of America.

In our opinion, the financial statements referred to above present fairly, in all material respects, the admitted assets, liabilities, and surplus of the Colorado Intergovernmental Risk Sharing Agency as of December 31, 2002 and 2001, and the results of its operations and its cash flow for the years then ended on the basis of accounting described in note 1.

The reconciliation of reserves for unpaid losses and loss adjustment expenses and the ten-year loss development information on pages 17, 18, and 19 are not required parts of the basic combined statutory financial statements of the Colorado Intergovernmental Risk Sharing Agency, but are supplementary information required by the Governmental Accounting Standards Board. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the supplementary information. However, we did not audit this information and express no opinion on it.

This report is intended solely for the information and use of the board of directors and management of the Agency and the Division of Insurance of the State of Colorado and should not be used by anyone other than these specified parties.

*KPMG LLP*

*no personal names or signatures in entire "report." (5)*

March 14, 2003

KPMG LLP KPMG LLP, a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

APPENDIX 

## LETTUNICH & VANDERBLOEMEN, LLC
### ATTORNEYS AT LAW
ALPINE OFFICE BUILDING
200 LINCOLN AVENUE, SUITE 300
P.O. BOX 773990
STEAMBOAT SPRINGS, COLORADO 80477

ANTHONY B. LETTUNICH
JOHN A. VANDERBLOEMEN

TELEPHONE
(970) 879-0100

TELECOPIER
(970) 879-0880

City of Steamboat Springs

0155. Litigation

August 11, 2003
Page 5

Matter - <u>Sieverding - Litigation</u>

|        |                                                                                                                                                                                                                                                                                                                                                                            | <u>Hours</u> | <u>Amount</u> |
|--------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|------------|
| 6/24/3 | Telephone call from Dave Brougham advising me that the clerk for Magistrate Schlatter advised that no Reply would be necessary. Brougham indicated he may file a motion to strike because of the scurrilous and salacious nature of the assertions made by Mrs. Sieverding.  Also discussed recovery of attorney fees and issues related to an injunction preventing her from filing any other lawsuits with an attorney.  Reviewed new emails from Sieverding. | 0.60  | 96.00      |
| 6/26/3 | Review two new emails from Sieverdings forwarded to me by Dave Brougham.  Email Dave Brougham with inquiry.                                                                                                                                                                                                                                                            | 0.40  | 64.00      |
|        | For professional services rendered                                                                                                                                                                                                                                                                                                                                    | 6.70  | $1,072.00  |
|        | Previous balance                                                                                                                                                                                                                                                                                                                                                      |       | $1,360.00  |
| Payment - Thank You |                                                                                                                                                                                                                                                                                                                                            |       | ($1,360.00)|
|        | Balance due                                                                                                                                                                                                                                                                                                                                                           |       | $1,072.00  |



Hon. Edward W. Nottingham
October 28, 2003
page 2

Plaintiffs' assertion that they were considering *filing* motions for default judgment and/or summary judgment. The ABA responded -- apparently too succinctly -- that it would object to the *filing* of a motion for default judgment as inappropriate because the ABA had responded to the Complaint by filing its motion to dismiss; however, the ABA would not object to the *filing* of a motion for summary judgment *on the same basis*.[2]

The ABA therefore respectfully asserts that Plaintiffs have no basis on which they might state that the ABA will not oppose their motion for summary judgment. In fact, the ABA hereby specifically reserves its right to oppose said motion if and when a response is required.

If your Honor prefers that this request be presented by formal motion, or has any questions or needs further information concerning this request, I respectfully ask that your Honor's clerk call me at (312) 988-6684, or e-mail me at larsonp@staff.abanet.org.

Thank you very much for your Honor's consideration of this request.

Respectfully submitted,

Patricia J. Larson

Enclosures

cc:    Darryl DePriest, General Counsel
       American Bar Association (w/o enclosures)
       Kay Sieverding, David Sieverding, Ed Sieverding and Tom Sieverding (via first
          class mail) (w/enclosures)

---

three pages of the e-mail string are portions of my previous e-mail to Ms. Sieverding, interspersed among her comments. I apologize to this Court that the string as here presented is difficult to follow but, unfortunately, I did not retain the individual e-mails.

[2] As stated within the body of the e-mail string, I had responded to Ms. Sieverding on or about July 11, 2003 that, "because there is a pending motion to dismiss, a motion for default judgment is not appropriate." Ms. Sieverding responded that she had looked through the rules of civil procedure and a textbook and "cannot find anyplace that says we can't put in a motion for summary judgement [sic] or a motion for default judgement [sic] just because you filed a motion to dismiss." Based on Ms. Sieverding's reference to "putting in" -- which I interpreted as *filing* -- I responded: "We will object to a motion for default judgment [as not appropriate because the ABA had responded to the Complaint]. We will not object to a motion for summary judgment [on the same basis]."

Defending Liberty
Pursuing Justice

PATRICIA J. LARSON
Associate General Counsel

AMERICAN BAR ASSOCIATION

Office of the General Counsel
541 North Fairbanks Court
Chicago, Illinois 60611
(312) 988-6684
FAX: (312) 988-5217

02-N1-1950(053)

October 28, 2003

**VIA FEDERAL EXPRESS**

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

OCT 2 9 2003

GREGORY C. LANGHAM
CLERK

Hon. Edward W. Nottingham
United States District Court for the District of Colorado
1929 Stout Street
Denver, Colorado  80294-3589

Re:     Letter Motion of the American Bar Association in the Matter Captioned
        *Sieverding et al. v. Colorado Bar Association et al.*, Civil Action No. 02-
        CV-1950, Requesting that this Court Stay Plaintiffs' Motion for Partial
        Summary Judgment as against It, as well as the Response Time thereto.

Dear Judge Nottingham:

Defendant American Bar Association ("ABA") respectfully requests that, based on the
posture of this case, this Court accept this Letter Motion in lieu of a formal motion.

On October 14, 2003, Magistrate Judge Schlatter filed his "Recommendation for
Dismissal of All Claims against All Defendants and Recommendation that Plaintiffs Be
Ordered To Pay Attorneys Fees and Costs," in which he concluded, *inter alia,* that the
ABA should be dismissed from the above captioned action. Nevertheless, on October 20,
2003, the *pro se* Plaintiffs filed a motion for partial summary judgment against the ABA
and the Colorado Bar Association.

The ABA respectfully requests that Plaintiffs' motion as against the ABA be stayed, as
well as the time in which the ABA is required to respond to Plaintiffs' motion, until such
time as this Court rules on the Magistrate Judge's Recommendation. A proposed order is
attached as Attachment A, for the Court's convenience.

The ABA also requests that this Court allow it to clarify one statement made in Plaintiffs'
motion. Plaintiffs state, at page 2, that the ABA "will not oppose a motion for summary
judgment." First, the statement made by the ABA was that it "will not *object* to a motion
for summary judgment." (emphasis added).[1]   Second, this statement was a response to

---
[1] The first three pages of a 32-page e-mail string are attached as Attachment B.  (Pages 3 through 32 were
a draft of plaintiffs' proposed motion for default judgment).  At the top of the string is my statement that
the ABA "will not *object* to a motion for summary judgment."  (emphasis added).  Included in the first

242

**C O P Y**          **FAEGRE & BENSON LLP**          **C O P Y**

2200 WELLS FARGO CENTER, 90 SOUTH SEVENTH STREET
MINNEAPOLIS, MINNESOTA 55402-3901
TELEPHONE 612.766.7000
FACSIMILE 612.766.1600
www.faegre.com

JOHN P. BORGER
jborger@faegre.com
612.766.7501

February 1, 2005

Hon. John R. Tunheim
United States District Court
300 South Fourth Street, Suite 13E
Minneapolis, MN 55415

     **Re:   David and Kay Sieverding v. Faegre and Benson LLP et al.**
           **Court File No. 04-4317 JRT/FLN**
           **F&B File No.  293075**

Dear Judge Tunheim:

     Enclosed in the above-referenced matter is a courtesy copy of Defendants' Response
to Objection on Magistrate Judge's Report and Recommendation, which was filed
electronically with the Court yesterday.

     Please feel free to call me with any questions.

                               Sincerely,

                               John P. Borger

JPB:borjp

cc:   Kay Sieverding (w/o encl.)
     David Sieverding (w/o encl.)
     Chris Beall (w/o encl.)
     Eric Jorstad (w/o encl.)

M2:20689242.01

*Minnesota   Colorado   Iowa   London   Frankfurt   Shanghai*

Colorado Intergovernmental Risk Sharing Agency                                                                        8/15/05 3:19 PM



    

August 15, 2005

Colorado Intergovernmental Risk Sharing Agency

**Overview**
**Coverage**
**Services**
**Membership**
**Seminars**
**Videos/Manuals**
**News**
**CIRSA Staff**
**Contact Us**
**Safety Training**

web master 
search site
links

## Copyright

All web site design, text, graphics, the selection and arrangement thereof, and all software Copyright 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004 CIRSA. ALL RIGHTS RESERVED. Permission is granted, solely to CIRSA members, to electronically copy and to print hard copy portions of this web site for the sole purpose of filing a member claim or using this web site as a member resource. Any other use of materials on this web site - including reproduction for purposes other than those noted above, modification, distribution, or republication - without the prior written permission of CIRSA is strictly prohibited.

## Trademark

CIRSA, Colorado Intergovernmental Risk Sharing Agency, www.cirsa.org and all page headers, custom graphics and button icons are service marks, trademarks, and/or trade dress of CIRSA. All other trademarks, product names and company names of logos cited herein are the property of their respective owners.

## Disclaimer

CIRSA IS PROVIDING THIS SITE AND ITS CONTENTS ON AN "AS IS" BASIS AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WITH RESPECT TO THIS SITE OR ITS CONTENTS. CIRSA DISCLAIMS ALL SUCH REPRESENTATIONS AND WARRANTIES, INCLUDING FOR EXAMPLE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN ADDITION, CIRSA DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION ACCESSIBLE VIA THIS SITE IS ACCURATE, COMPLETE, OR CURRENT. INFORMATION ON THIS WEB SITE IS SUBJECT TO CHANGE WITHOUT NOTICE.

Neither CIRSA, nor its Board of Directors, nor any of its directors, employees, agents, or other representatives, will be liable for damages arising out of or in connection with the use of this web site. This is a comprehensive Limitation of Liability that applies to all damages of any kind, including (without limitation) compensatory, direct, indirect or consequential damages, loss of data, income or profit, loss of or damage to property and claims of third parties.

Copyright © 2001 - 2005 Click here for more information | Site by eonBusiness ™

To be attached as exhibit to Sieverding v. CIRSA filed 1/3/04

KAY SIEVERDING                    D244 10/30/03        (unopposed)

DAVID SIEVERDING                                       05-2DWF/JSM

ED SIEVERDING, AND

TOM SIEVERDING

PRO-SE PLAINTIFFS

641 BASSWOOD AVE

VERONA, WI 53593

608 848 5721

02N1950 (OES)

IN THE UNITED STATES DISTRICT COURT OF

THE DISTRICT OF COLORADO

Colorado Bar Association et al.

Defendant

---

Motion for partial summary judgment that the plaintiffs are included in the "insured" under the CITY of Steamboat Springs Public Officials Errors and Omissions Insurance and Employee Crime Insurance

---

1.) The CITY of Steamboat Springs has purchased both public officials errors and omissions insurance and employee crime insurance.

2.) The insurance was paid for with taxpayer dollars.

3.) The definition of insured in the statements includes anyone in contract with the insured.

4.) By definition taxpayers and citizens must be in contract with their local governments.

5.) The plaintiffs were citizens and taxpayers in the jurisdiction of the CITY of Steamboat Springs from 1991 to 2001.

6.) The public officials errors and omissions insurance excludes only willful and wanton acts.

7.) The employee crime insurance includes acts undertaken for the employees' financial benefit over their contracted pay.

8.) If some employees engaged in crime and the other employees didn't realize it, then the failure to correct the employee crime would not be willful and wanton and would therefore be covered as errors and omissions.

9.) The employee crime insurance is not confined to embezzlement, violent crime, or crime on premises.

10.) "We will enforce the policy as written, unless there is an ambiguity in the policy language. See Union Ins., 883 P.2d at 1061; Ballow v. PHICO Ins. Co., 875 P.2d 1354, 1359 (Colo. 1993). A policy provision is ambiguous if it is reasonably susceptible on its face to more than one interpretation. See Union Ins., 883 P.2d at 1061; Parrish, 874 P.2d at 1055. In determining whether there is an ambiguity in a policy provision, we must evaluate the policy as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended. See Union Ins., 883 P.2d at 1061; Parrish, 874 P.2d at 1055; Ballow, 875 P.2d at 1359; Chacon, 788 P.2d at 750. A mere disagreement between the parties regarding the

meaning of a policy term does not create an ambiguity. See Union Ins., 883 P.2d at 1061; Parrish, 874 P.2d at 1055.[28]    When a contractual provision is clear and unambiguous, courts should neither rewrite it nor limit its effect by a strained construction. See Parrish, 874 P.2d at 1055; Terranova v. State Farm Mut. Auto. Ins. Co., 800 P.2d 58, 60 (Colo. 1990). Thus, in the absence of ambiguity, an insurance policy must be given effect according to the plain and ordinary meaning of its terms. See Farmers Ins. Exch. v. Dotson, 913 P.2d 27, 30 (Colo. 1996)." (State Farm Mutual Automobile Insurance Co. v. Stein, 940 P.2d 384 (Colo. 06/30/1997) Colorado Supreme Court, NO. 96 SC283940 P.2d 384, 1997.co

11.) There is nothing in the 200 page policy that indicates that the intent of the insurance was not to cover taxpayers and citizens of the insured local government.

12.) There is no requirement in the insurance policies that taxpayers and citizens must have a written contract, as opposed to an implied contract, to be covered under either the public officials errors and omissions insurance or the employee crime insurance.

13.) Various city attorneys around the country have asserted that the local public is the intended beneficiary of their contract to provide city attorney services. If local citizens and taxpayers are the intended beneficiary of an implied contract for city attorney services, they must also be the intended beneficiaries of an implied contract for insurance unless specifically excluded.

14.) The CITY did not receive any claims procedures or clarifications from the insurance company that would indicate that its citizens and taxpayers would not be insured.

15.) The statutory authorization for the Colorado Intergovernmental Risk Sharing Authority

   (CIRSA) from which the CITY purchased its insurance is C.R.S. 24-10-115.5.

   "Authority for public entities to pool insurance coverage." The Statute text includes "(6)

   (a) The certificate of authority issued to a public entity under this section may be revoked

   or suspended by the commissioner of insurance for any of the following reasons: ….(VI)

   Use of methods which, although not otherwise specifically proscribed by law,

   nevertheless render the operation of the self-insurance pool hazardous, or its condition

   unsound, to the public;"

16.) The insurance policy provides no claims procedures to the injured public other than

   lawsuit.

17.) The insurance company, CIRSA, the reinsurance company Northfield Insurance AKA

   Traveler's Insurance, the CITY, and Hall and Evans have refused to provide a claims

   form or identify a claims agent.

18.) It is obviously hazardous to the public if the insurance pool is used to raise the costs to

   the victim of claiming public officials errors and omissions or public employee crime and

   no claims procedures other than lawsuit are provided.

19.) It is obviously hazardous to the public if the insurance pool is used to protect the

   perpetrators of crime but not the victims.

20.) Contracts which have an illegal outcome or outcome contrary to public policy are

   invalid.

Verification

4

The plaintiffs hereby declare under penalty of perjury that to the best of their knowledge and belief everything included in this document, and all other documents filed with the Court, is true and correct.

DAVID SIEVERDING                    KAY SIEVERDING

ED SIEVERDING                       TOM SIEVERDING

Address for all 641 Basswood Ave, Verona, WI 53593 phone 608 848 5721

5

Certificate of Service In the United States Court For the District of Colorado Case 02-M-1950 (OES) The Undersigned certifies that copies were delivered on or before 10/29/03 to FEDEX or U.S. Mail box.

| | |
|---|---|
| John Palmeri ( x 4314)<br>Brett N Huff (left message on general mail box)<br>White and Steele for CBA<br>    950 17th St, 21st floor<br>    Denver, CO 80202<br>    303 296 2828<br>    fax 303 296 3131<br>    JPalmeri@wsteele.com<br>    bhuff@wsteele.com | David Brougham<br>Hall and Evans, LLC<br>1225 Seventeenth St, Suite 600<br>Denver, CO 80202-<br>303 6283300<br>303 628 3327 (his number)<br>fax 303 628 3368<br>broughamd@hallevans.com |
| Charles W. Lance, Jr.<br>751 Silver Oak Gry<br>Colorado Springs, CO 80906 | Thomas Kelley/Christopher P. Beall/Eileen Kiernan Johnson<br>Faegre & Benson<br>1700 Lincoln St.<br>3200 Wells Fargo Center<br>Denver, CO 80202<br>303 607 3500<br>303 607 3500, 303 607 3600 fax,<br>tkelley@faegre.com |
| Traci L. Van Pelt/Michael T McConnell/Troy R. Backman/Megan E. Pound<br>McConnell Siderious etc.<br>2401 15th St Suite 300<br>Denver, CO, 80302<br>303 458 9540<br>fax 303 458 9520<br>tvanpelt@msfhc.com,<br>mmcconnell@msfhc.com | James B.F. Oliphant<br>PO 77425<br>919 Oak St<br>Steamboat Springs, CO 80477<br>970 879 6060 x 13<br>fax 970 879 5199<br>trial@oho.law.com<br>Loretta |
| Patricia J. Larson<br>American Bar Association<br>Office of General Counsel<br>541 N. Fairbanks Ct<br>Chicago, IL 60611<br>LarsonP@staff.abanet.org<br>fax 312 988 5217<br>phone 312 988 6684 | |

Kay Sieverding

To be attached as exhibit to Sieverding v. CIRSA filed 1/3/04

KAY SIEVERDING                    D244 10/30/03          (unopposed)

DAVID SIEVERDING                                     05-2DWF/JSM

ED SIEVERDING, AND

TOM SIEVERDING

PRO-SE PLAINTIFFS

641 BASSWOOD AVE

VERONA, WI 53593

608 848 5721

02N1950 (OES)

IN THE UNITED STATES DISTRICT COURT OF

THE DISTRICT OF COLORADO

Colorado Bar Association et al.

Defendant

---

Motion for partial summary judgment that the plaintiffs are included in the "insured" under the
CITY of Steamboat Springs Public Officials Errors and Omissions Insurance and Employee
Crime Insurance

---

1.) The CITY of Steamboat Springs has purchased both public officials errors and omissions
   insurance and employee crime insurance.

2.) The insurance was paid for with taxpayer dollars.

3.) The definition of insured in the statements includes anyone in contract with the insured.

1

4.) By definition taxpayers and citizens must be in contract with their local governments.

5.) The plaintiffs were citizens and taxpayers in the jurisdiction of the CITY of Steamboat Springs from 1991 to 2001.

6.) The public officials errors and omissions insurance excludes only willful and wanton acts.

7.) The employee crime insurance includes acts undertaken for the employees' financial benefit over their contracted pay.

8.) If some employees engaged in crime and the other employees didn't realize it, then the failure to correct the employee crime would not be willful and wanton and would therefore be covered as errors and omissions.

9.) The employee crime insurance is not confined to embezzlement, violent crime, or crime on premises.

10.) "We will enforce the policy as written, unless there is an ambiguity in the policy language. See Union Ins., 883 P.2d at 1061; Ballow v. PHICO Ins. Co., 875 P.2d 1354, 1359 (Colo. 1993). A policy provision is ambiguous if it is reasonably susceptible on its face to more than one interpretation. See Union Ins., 883 P.2d at 1061; Parrish, 874 P.2d at 1055. In determining whether there is an ambiguity in a policy provision, we must evaluate the policy as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended. See Union Ins., 883 P.2d at 1061; Parrish, 874 P.2d at 1055; Ballow, 875 P.2d at 1359; Chacon, 788 P.2d at 750. A mere disagreement between the parties regarding the

2

meaning of a policy term does not create an ambiguity. See Union Ins., 883 P.2d at 1061;

Parrish, 874 P.2d at 1055.[28]      When a contractual provision is clear and

unambiguous, courts should neither rewrite it nor limit its effect by a strained

construction. See Parrish, 874 P.2d at 1055; Terranova v. State Farm Mut. Auto. Ins. Co.,

800 P.2d 58, 60 (Colo. 1990). Thus, in the absence of ambiguity, an insurance policy

must be given effect according to the plain and ordinary meaning of its terms. See

Farmers Ins. Exch. v. Dotson, 913 P.2d 27, 30 (Colo. 1996)." (State Farm Mutual

Automobile Insurance Co. v. Stein, 940 P.2d 384 (Colo. 06/30/1997) Colorado Supreme

Court, NO. 96 SC283940 P.2d 384, 1997.co

11.) There is nothing in the 200 page policy that indicates that the intent of the insurance was

not to cover taxpayers and citizens of the insured local government.

12.) There is no requirement in the insurance policies that taxpayers and citizens must have a

written contract, as opposed to an implied contract, to be covered under either the public

officials errors and omissions insurance or the employee crime insurance.

13.) Various city attorneys around the country have asserted that the local public is the

intended beneficiary of their contract to provide city attorney services. If local citizens

and taxpayers are the intended beneficiary of an implied contract for city attorney

services, they must also be the intended beneficiaries of an implied contract for insurance

unless specifically excluded.

14.) The CITY did not receive any claims procedures or clarifications from the insurance

company that would indicate that its citizens and taxpayers would not be insured.

3

15.) The statutory authorization for the Colorado Intergovernmental Risk Sharing Authority

(CIRSA) from which the CITY purchased its insurance is C.R.S. 24-10-115.5.

"Authority for public entities to pool insurance coverage." The Statute text includes "(6)

(a) The certificate of authority issued to a public entity under this section may be revoked

or suspended by the commissioner of insurance for any of the following reasons: ....(VI)

Use of methods which, although not otherwise specifically proscribed by law,

nevertheless render the operation of the self-insurance pool hazardous, or its condition

unsound, to the public;"

16.) The insurance policy provides no claims procedures to the injured public other than

lawsuit.

17.) The insurance company, CIRSA, the reinsurance company Northfield Insurance AKA

Traveler's Insurance, the CITY, and Hall and Evans have refused to provide a claims

form or identify a claims agent.

18.) It is obviously hazardous to the public if the insurance pool is used to raise the costs to

the victim of claiming public officials errors and omissions or public employee crime and

no claims procedures other than lawsuit are provided.

19.) It is obviously hazardous to the public if the insurance pool is used to protect the

perpetrators of crime but not the victims.

20.) Contracts which have an illegal outcome or outcome contrary to public policy are

invalid.

Verification

4

The plaintiffs hereby declare under penalty of perjury that to the best of their knowledge

and belief everything included in this document, and all other documents filed with the Court, is

true and correct.

DAVID SIEVERDING                     KAY SIEVERDING

ED SIEVERDING                        TOM SIEVERDING

Address for all 641 Basswood Ave, Verona, WI 53593 phone 608 848 5721

Certificate of Service In the United States Court For the District of Colorado Case 02-M-1950 (OES)  The Undersigned certifies that copies were delivered on or before 10/29/03 to FEDEX or U.S. Mail box.

| | |
|---|---|
| John Palmeri ( x 4314)<br>Brett N Huff (left message on general mail box)<br>White and Steele for CBA<br>   950 17th St, 21st floor<br>   Denver, CO 80202<br>   303 296 2828<br>   fax 303 296 3131<br>   JPalmeri@wsteele.com<br>   bhuff@wsteele.com | David Brougham<br>Hall and Evans, LLC<br>1225 Seventeenth St, Suite 600<br>Denver, CO 80202-<br>303 6283300<br>303 628 3327 (his number)<br>fax 303 628 3368<br>broughamd@hallevans.com |
| Charles W. Lance, Jr.<br>751 Silver Oak Gry<br>Colorado Springs, CO 80906 | Thomas Kelley/Christopher P. Beall/Eileen Kiernan Johnson<br>Faegre & Benson<br>1700 Lincoln St.<br>3200 Wells Fargo Center<br>Denver, CO 80202<br>303 607 3500<br>303 607 3500, 303 607 3600 fax,<br>tkelley@faegre.com |
| Traci L. Van Pelt/Michael T McConnell/Troy R. Backman/Megan E. Pound<br>McConnell Siderious etc.<br>2401 15th St Suite 300<br>Denver, CO, 80302<br>303 458 9540<br>fax 303 458 9520<br>tvanpelt@msfhc.com,<br>mmcconnell@msfhc.com | James B.F. Oliphant<br>PO 77425<br>919 Oak St<br>Steamboat Springs, CO 80477<br>970 879 6060 x 13<br>fax 970 879 5199<br>trial@oho.law.com<br>Loretta |
| Patricia J. Larson<br>American Bar Association<br>Office of General Counsel<br>541 N. Fairbanks Ct<br>Chicago, IL 60611<br>LarsonP@staff.abanet.org<br>fax 312 988 5217<br>phone 312 988 6684 | |

Kay Sieverding

David and Kay Sieverding                04cv4317 JRT/FLN

Pro se litigants                        jury demand

641 Basswood Ave                        Docket 35 (improved from 33 and 34)

Verona, WI 53593                        filed 01/04/05

608-848-5721

v.

Faegre and Benson LLP and Steamboat Pilot/Today Newspaper/Internet Publication

WorldWest LLC, Ralph Gage, The World Company, Simons Family Management or other

owner of Steamboat Pilot/Today known collectively as MEDIACOMPANY

---

(Second Edited) Motion for partial summary judgment that intentional republication of

defamatory material on the Internet should be adjudicated under the multi-publication rule

because the publications fit the description of multiple publications,  multiple Internet

publication is an explicitly insurable risk, and the Wisconsin retraction statute adequately

protects the first amendment interests of MEDIACOMPANY.

1.Plaintiffs were mistaken in nicknaming the Steamboat Pilot newspaper Internet

publication, WorldWest LLC, The World Company, Ralph Gage, and the Simons Family

Management "NEWSPAPER".  A more accurate nickname is "MEDIACOMPANY".

2.Most discussions of single publication and multiple publication refer to the legal industry

publication, the Restatement of Torts, the last edition of which was published before the

Internet was established.

1

3.The Restatement of Torts legal treatise must be considered as a whole, not just as a sum of paragraphs.

4.The 2nd Restatement of Torts extends liability in time for intentional defamation if retraction is requested but denied. The "single publication rule" applies only to uncontrollable redistribution of already printed paper documents and is based on the impracticality of going door to door to collect newspapers and a lawsuit based on a defaming newspaper article found 17 years after its printing.

5.Thus, in the situation anticipated by the Restatement of printed papers in distribution, the effect of the defamation is assumed to be buffered by public retraction. That is a specific legislative requirement in the Plaintiffs PRIVATE CITIZENS home state of Wisconsin.

6.The Restatement specifically exempts re-broadcasting of motion pictures from the single publication rule even though it costs money to edit motion pictures, or they may lose all commercial value.

7.All of the discussions of defamation center on malice—whether the intent was to publish in knowing disregard of the truth or knowledge of probable falsity. The reason why the common law distinguishes between the morning publication of a paper newspaper and the afternoon publication of a paper newspaper is that the article could have been corrected at noon.

8. The current publications of defamation per se by the defendants is done with malice,with knowledge of their false statements and damaging effects and with a deliberate refusal to respond to requests for retraction.

9. The Internet infrastructure and technology also exist outside the United States, have been adjudicated by courts outside the United States, and have been reviewed by industry, government and public committees outside the United States.

10. The United Kingdom found a simple and inexpensive solution to correction of articles published on the Internet that are found to be defamatory. A retraction is to be pasted to each page. This is inexpensive, technically easy and well within the capabilities of the Steamboat Pilot and the resources of SIMONS FAMILY MANAGEMENT who boast about being at the forefront of Internet publication.

11. The articles accusing Plaintiffs of criminal activity featuring their unusual name in the headline and text could be easily modified to substitute "Citizen" "Woman" "Mother" "Neighbor" or other description and would lose no legitimate value by so doing.

12. The Firth v. New York State case repeatedly cited by defendants as allowing them to republish accusations of crime and professional incompetence for eternity without liability is inapplicable to this lawsuit.

13. Plaintiffs live in Wisconsin not New York.

14. Both plaintiffs and defendants rights in this case are defined by the Wisconsin defamation statute. If defendants had responded to plaintiffs retraction and correction requests, made repeatedly from April to October 2004, they would have gained immunity. Knowing this, MEDIACOMPANY chose not to. It turns out that the reason they did so is that they thought they could stop plaintiffs from accessing the courts for defamation after the 02-1950 case was transferred to appellate court.

3

15. The Supreme Court of New York wouldn't be allowed to overrule a New York State statute that was consistent with the Constitution. Their decision in Firth v. New York doesn't overrule settled Wisconsin law. The retraction statutes have been in place in WI, MN, CA, FL, NC and other states for years and the only criticism of them is whether they provide enough protection to citizens.

16. Plaintiff read a lot of case law and legal authorities on defamation and didn't find one complaint that publication of retraction was too burdensome for the publisher of defamatory information. The CO Supreme Court implied that defamed citizens or businesses should be allowed to sue even if retraction is prompt, sincere, and adequate. The retraction standard is historically meant to protect news publishers.

17. Much has been written about the inevitable tension between rights of citizens to protect their names and reputations and first amendment rights. The retraction laws were passed in an attempt to establish a line between the two, a way to accommodate both interests.

18. At the time the retraction laws were written, the legislative intent was to protect small independent publishing companies. Usually these were small newspapers with limited funding. In the historical context, those requesting retraction were often those with power—the politician, the big employer, the union buster.

19. The lawmakers were trying to protect those with less power, the small independent newspapers, not those with the most power, the big companies.

20. At the time the retraction laws and restatement of torts were adopted, publishers were much more vulnerable than they are now. 50 years ago, for instance, the Steamboat Pilot was a family business operating from only one location and covering news in only one

4

locality. Today the Steamboat Pilot is a subsidiary of a corporation, The World Company, that owns and operates cable television and a consulting firm. It publishes on paper newspapers in at least five different cities and on multiple commercial web sites.

21. Publishers today buy liability insurance from large multinational insurance companies such as Sun Alliance and these companies are trying to limit the potential liability of publishers in every court proceeding they can, in every public discussion they can, with every contact they have.

22. The Supreme Court of New York is a compromised court. As reported by the New York Times, two of its judges were found in recent years to have accepted a bribe. Therefore, all their decisions including Firth v. New York State must be subjected to extra scrutiny.

23. The facts of the Firth case concern unintentional defamation in a static government database. Such defamation could result from data entry mistakes or mistaken identification. They are much different from intentional defamation by a commercial publisher for the benefit of advertisers.

24. It is probable that the New York judges did not understand how the Internet has developed in a very few years from an open forum to a forum for sale controlled by key words and payment for "hits" and by commercial search engine companies. It is probable that the New York judges had no knowledge of web design and publishing technology, which has changed greatly and recently.

25. The state retraction statutes were designed to be the minimally accepted standard for protection of the public.

5

26. The public cannot allow their rights to protect their names and reputations to fall below

the line defined by the retraction statutes. (Retraction and correction within statutory period

after request eliminates liability.  Failure to retract and correct establishes liability.)

27. Freedom to protect one's name and reputation by accessing the court system is an

essential common law and constitutional right.

28. In this case, plaintiffs PRIVATE CITIZENS have plead that continued publication of

baseless accusations of crime and incompetence could affect all of their income and

employment opportunities for the rest of their lives as well as all of their social opportunities

and their private feelings of security. In other words, the defamation on the Internet could

affect almost all future aspects of their lives. If one of PRIVATE CITIZENS were to die, for

instance, the defamation could reduce or eliminate the remaining spouses' remarriage

opportunities.  The defendants' publications of baseless accusations of crime and stupidity

interfere with plaintiffs' primary rights to make a conscious choice as to how they portray

themselves to the world.  Not only could the defamatory publications result in loss of

opportunity, they could illicit additional crimes hurting plaintiffs.

29. The value of the rest of plaintiffs' lives, to them, exceeds the state and federal caps on

punitive damages for tort and constitutional violation claims.

30. The state tort limit claims and the Supreme Court 10 times limitation for federal claims

were not intended to be lifetime limits.  For instance, owners of a patent may sue multiple

times for patent violations.  Those 3 and 10 times limits were intended to apply to one

lawsuit for damages covered by a period of time defined in each lawsuit.  Courts have

repeatedly held that abatable torts such as pollution, nuisance, trespass, credit reporting

6

violations, professional qualifications denigration, and false imprisonment result in new rights to remedy through financial judgment as they continue unabated.

32. The Court cannot take away one's right to sue because our system of consensual government is predicated on the availability of the tort system for deterrence and remedy.

33. Defamation is the oldest litigated tort. Defamation is litigated in every justice system. The tort system was developed as an alternative to dueling to defend one's reputation.

34. Self-defense is a fundamental characteristic of life. No conscious life form has been found by scientists that will not fight back when necessary.

35. If it was made law that publishers could knowingly defame on the Internet without fear of lawsuit, then those whose backs are against the wall, like Marvin Heemeyer, will look for another forum such as face-to-face confrontation or violence. The whole idea of making sure that the tort system is available to everyone is to promote an efficient and safe society. If any number of people are denied income and social freedom because they are defamed on the Internet and they are denied effective access to the tort system, then the public will face great extra risks as those people seek to reclaim their personal freedom outside the court system. Like the plaintiffs, the defamed are not just going to disappear and die quietly. Furthermore, society will lose essential freedoms if publishers could simply pay $750,000 or other sum as a lifetime license to defame a private person.

36. The article libraries potentially publishable on the Internet of MEDIACOMPANY increase its total asset value, as boasted by the SIMONS FAMILY MANAGEMENT.

37. The article libraries on the Internet publications attract users to their sites, increasing the measurable number of "hits" and increase advertising revenues.

38. It is axiomatic in business that sales include risks. Defamation liability is a known risk of publishing and publishers are taught to avoid that risk by accurate reporting.

39. One of the accepted "markers of liability" is the availability of insurance for the activity.

40. In recognition of the extra risks of defamation and privacy lawsuits because of Internet publications, media insurers such as Royal and Sun Alliance ProFin Libel and Professional Liability Insurance Libel & Professional Indemnity, charge more for Internet publications.

41. An advertisement by Royal and Sun Alliance updated on the Internet on 12/21/2004 (download available) is explicit about the risks and the costs:

"**Media companies such as publishers are well aware of the pitfalls** of producing literature which is inaccurate, or **of making statements which are damaging to the reputation of another person** or company. In fact, organizations in many industries issue some form of publication and are potentially exposed to allegations of libel or infringement of copyright as a result of their normal business sales literature. The rapid increase in electronic publishing has added a new dimension to the problem."

42. "The consequences of errors or omissions by those involved in the publishing and distribution of material are perhaps less widely recognized. Depending on the nature of the material being published, third parties may incur financial losses as a result of relying on negligent information, and it is those responsible for producing the information and putting it into circulation who will be most at risk from legal actions."

43. "The Royal & SunAlliance ProFin Libel & Professional Indemnity Policy has been designed with the above diverse concerns in mind."

44. "The policy has been developed to meet the needs of a wide range of publishers or broadcasters. As well as specialists in this field, other entities produce and distribute material, which may expose them to both Libel and PI claims."

45. The SunAlliance advertisement is explicit in that a key feature includes:

"**The policy will respond to claims arising from material published by the Insured on the internet or other electronic media such as email or on-line databases**".

8

46. The SunAlliance advertisement specifies: **"consideration will be given to providing cover with full worldwide jurisdiction if requested"**.

47. The SunAlliance advertisement specifies **"cover is fully retroactive".**

48. The SunAlliance advertisement offers "assistance… with risk management initiatives".

49. For pricing, SunAlliance requires annual turnover and fee income of the company and the nature and extent of the proposer's use of the Internet and/or email. This is consistent with the knowledge that the extent of distribution is a factor in the amount of damages.

50. SunAlliance advertises that it has more than 30 years of experience in writing libel insurance.

51. SunAlliance "policy features include comprehensive definition of wrongful acts covered in addition to libel including slander, injurious or malicious falsehood..unintentional infringement of database rights…infringement of a right to privacy contained in any statute…**cover for material published on the internet or other electronic media such as email or on-line databases…Withdrawal expenses for losses incurred in withdrawing a publication or making alterations therein.** "

52. Thus withdrawal and correction of publications on the Internet is anticipated as a normal part of modern media business.

53. Sun-Alliance offers this coverage world-wide.

54. Sun-Alliance, Lloyds and other UK insurers are active in the U.S. market. For instance, they sold government liability insurance in Colorado in recent years.

55. Similar insurance is available from other carriers. For instance, Beazley Furlonge Syndicate 2623/623 at Lloyds offers such insurance and states on the Internet:

"Specialty lines has focused on writing specialty insurance in selected markets and is an established lead underwriter in many lines. A significant portion of this business is written in the U.S. excess and surplus lines market."

9

56. Lloyds syndicate 2623/623 specifically offers "US Technology Media Professional

Liability."

57. This Lloyds insurance is so well established that it also sells "US Directors and Officers

Liability" and "US Lawyers Professional Liability" (see www.Beazley.com/products).

58. The footnotes to the CO constitution specifically state that newsman's privilege does not

extend to publication of falsehoods. There is no exception to publication after an initial

lawsuit or knowing republication after a period of time has passed.

59. The New York Court probably did not know how helpless the ordinary citizen has

become to fight Internet defamation. Even if a citizen puts a web site up to rebut the

defamation, it is improbable that anyone will see it whereas a commercial website pays for

hits.

60. In the wrong previous decisions, the Courts probably relied on this misinformation:

"in 1965 when the American Bar Association embarked on a project to develop
standards for all aspects of criminal justice, including guidelines to accommodate the right
to a fair trial and the rights of a free press. See Powell, The Right to a Fair Trial, 51 A.B.A.J.
534 (1965). The resulting standards, approved by the Association in 1968, received support
from most of the legal profession. American Bar Association Project on Standards for
Criminal Justice, Fair Trial and Free Press (Approved Draft 1968). Other groups have
undertaken similar studies. See Report of the Judicial Conference Committee on the
Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F.R.D. 391 (1968); Special
Committee on Radio, Television, and the Administration of Justice of the Association of the
Bar of the City of New York, Freedom of the Press and Fair Trial (1967). In the wake of
these efforts, the cooperation between bar associations and members of the press led to the
adoption of voluntary guidelines like Nebraska's"...

61. "Generally, it is not appropriate to disclose or report the following information because
of the risk of prejudice to the right of an accused to a fair trial:.... Opinions concerning the
guilt, the innocence or the character of the accused. Statements predicting or influencing the
outcome of the trial....such publication or broadcast should generally be avoided because
readers, viewers and listeners are potential jurors and an accused is presumed innocent until
proven guilty...The bar and the news media, through their respective associations, have
determined to establish a permanent committee ...to issue opinions as to their application to

10

specific situations, to receive, evaluate and make recommendations with respect to complaints and to seek to effect through educational and other voluntary means a proper accommodation of the constitutional correlative rights of free speech, free press and fair trial" Nebraska Press et al. v. Stuart. United States Supreme 1976.

62. However, the above safeguards to reputation described by the U.S.C. in 1976, which underlay court decisions for 30+ years, have disappeared. There isn't any permanent committee that plaintiffs can find. Nothing comes up on the Internet except outside the U.S.

63. Plaintiffs wrote to the ABA and the U.S. Supreme Court rulemaking administrative committee and asked them for the contact information on the committee described by the U.S.C. in 1986 but they didn't write back.

64. Plaintiffs found a site at Poynter Institute that purported to offer advice on defamation free article writing but apparently they only advise publishers not the public. Plaintiffs wrote to Poynter twice and weeks have passed with no response.

65. Without potential liability, too many Internet sites, such as the Steamboat Pilot, are willing and able to ruin your life.

66. Plaintiffs wouldn't be spending so much time to litigate this if it wasn't causing them great distress. Even today, 1/3/04, 10 weeks after service, the Steamboat Pilot continues the Internet defamation and refuses to respond to plaintiffs' requests for retraction and correction, even though it failed to dispute (in the previous related lawsuit 02-1950) that similar publications a few years ago were defamatory. Even today 1/4/04 at 4:30 am, plaintiff is so upset about the continued Internet defamation that she can't sleep. She is so upset about the continued defamation that she thinks about "it" every single day.

67. How to stop "it" the Internet defamation? Think. List. Brainstorm. There must be a way.

68. It is extremely distressing to plaintiffs to read on the Internet various defendants lawyers who maintain that knowing Internet defamation should be sheltered by the legal services industry.

69. The proposal that knowing Internet defamation should be allowed goes against centuries of court dramas about the pain of defamation.

70. The Magna Charta gives a common law right not to be accused of criminal conduct without a jury trial or according to the record of the land and does not allow citizens to be banished or their livelihoods to be destroyed in any way without a jury or according to the record of the land.

71. If the United States Courts allow knowing and deliberate Internet defamation, then this is not a free society and not a country worth living in.

72. Is it a coincidence that the big money paying to advance Internet defamation as a business option is derived from British royalty, descendants of those against the Magna Charta?

73. It is the stupidest thing plaintiff has ever heard of to seriously propose that if someone uses the Internet to destroy you, that anyone with any sense, could say that they want a society that won't let you go to court to stop them.

74. We all know, by 2005, that the Internet has the potential to totally destroy people's lives. To deny us love and money and party invitations. For many people, to result in loss of child custody. To cause the hurt or disapproval of your relatives. To lose status in every public or private forum. To be subjected to increased cost and decreased income.

75. I, Kay Sieverding, do hereby state that I believe my own parents think less of me because the Steamboat Pilot is publishing this garbage and I can't stop them.

76. Internet defamation is a dignatory tort, in the purest sense. Someone else is trying to control you and you can't get away from them. the intentional tortfeasor. There is no flight possibility. There is only fight possibility. One's body is flooded with cortisol. Every day more cortisol, if they don't stop. Getting them to stop the defamation becomes one's highest life priority.

77. Last Sunday, 1/2/04, 60 Minutes focused on the company "Google". They interviewed the founders. One of the Google founders commented that one problem the Google company designers have with the omnipresent google search engine is that no matter how many good things are on the Internet about one, the bad things usually show up more prominently. They can't figure out how to change that problem, they said.

78. Obviously, one solution, another safeguard, is for the injured parties, or their agents, to go to the site manager and request retraction. Of course, better to not have the injury the "reputation pollution" to begin with. An ounce of prevention is worth a pound of cure. But a cure is better than no cure.

79. Pollution is a good analogy to Internet defamation. They are both continuous torts and the statute of limitations shouldn't start until the invasion ends. And that is what the 2nd Restatement of Torts already says. Without retraction, liability continues.

80. As clear from this litigation, if the publishers don't think they will be sued, they won't stop.

81. In the case of THE SIMONS FAMILY MANAGEMENT/THE WORLD COMPANY/THE STEAMBOAT PILOT/FAEGRE AND BENSON/CHRIS BEALL, their reaction, of keeping the defamation up/ even today is not logical.

82. Plaintiffs for months on an almost daily basis, except when publication ceased for a few weeks, ask each other and various other people why do you think they are continuing to print these articles? Was it some sort of legal trick to gain strategic advantage in the other lawsuit? Were defendants trying to trick pro se plaintiffs in the 10th circuit into adding evidence and spoiling their perfect appeal/ summary judgment? Why now, when plaintiffs already won in the 10th Circuit?

83. The words, defamation per se, "THE WORLD COMPANY" is publishing, they publish knowing that plaintiffs really don't want them to publish them, that it really bothers them.

84. There is evil in the world. Plaintiffs trounced defendants in the last lawsuit, who really weren't expecting to lose to a pro-se litigant. It must just really gravel them. Because of Firth v. New York, they think, as MEDIACOMPANY'S LAWFIRM said, "you can't stop us".

85. It is already documented that the Internet is used to harass people. It is an easy medium to obsess out on and can be accessed when drinking, at home, in privacy, with no delays.

86. Do you think that the only people who have the potential to obsess out are some sort of second hand citizens like plaintiffs? Or do you think that wealthy and powerful people with big law resumes like FAEGRE AND BENSON, LLC and millions of dollars and four generations of success like the SIMONS FAMILY MANAGEMENT don't also have potentially obsessive personality characteristics?

14

87. Do you seriously propose that "they" should be able to control "us" because they feel obsessive or greedy?

88. The Internet has tales of all sorts of educated people like Chris Beall and Patricia Sprain sending thousands of defamatory emails. If the Court supports the stupid, stupid idea, that known and intentional Internet defamation can be made an activity immune from redress in court, bad bad things will happen. This is not a threat, it is inevitable.

89.Reading constitutional law, much is written about disputes seeking a forum. If one forum is not available, another will be found.

90. The whole idea of the tort system is to provide a safe forum to "fight it out".

91. What will happen to society if a bunch of big media chains with all sorts of connections and money get a few more judges to say that you can't stop media defamation?

92. There's money in media defamation. Plaintiff earlier submitted a motion to clarify the identity of the defendants, which included evidentiary facts about THE SIMONS FAMILY MANAGEMENT. They included interviews with the management about the Internet.

93. Several years ago, one of the SIMONS FAMILY MANAGEMENT gave an interview about the potential commercial value of the Internet. He touted their web sites, which actively sell real estate, nightly drink specials, single's connections, etc. He said that these, specifically including their "so-called archives"/proprietary article, forum, letters to the editor collections, have great commercial profit potential and value,

94. The reason they want more court opinions saying that they can print personal, embarrassing, and hurtful things about citizens, is that it is a source of profit. Also, as people, subject to emotions and impulse, the people in power in the media companies are

15

more likely to be aggressive, controlling, anal compulsive, and manipulative than your

average working person.

95. Power and money.

96.So Feagre and Benson, LLC, a large and powerful lawfirm, has, through two associates,

pushed the idea that they and their clients should be able to defame plaintiffs for "free"

97. DEFENDANTS are motivated to continue defamation on the Internet, and to defend it

in court, both to make money through a business model, and to personally hurt her, out of

personal nastiness, that can't just admit that they were way wrong in the other lawsuit and

lost is so big. They lack the will and moral imperative to stop it themselves. Why?

98.Back to the potential profits from business model issue.

99. Plaintiffs 84 year old, mother-in-law, recently told plaintiffs another story about the

defendants, THE STEAMBOAT PILOT finger of THE WORLD

COMPANY/MULTIMEDIA COMPANY.

100. The entire family knows an older man in Steamboat. Mother in law has known him,

and his wife, for 50 years. It turns out the Steamboat Pilot printed something identifying

this man by name. The Pilot printed in the paper, for all his lifelong friends, family, business

associates, and his wife's friends, family, etc. including plaintiff's mother-in-law to read,

that this married man had had an affair. Not only did he have an affair, apparently lasting

for several years, but the woman somehow asked him for money. And he told the police.

101. What was accomplished by printing this, with the man's name and identifying

information? Remember, this was your defendants' MEDIACOMPANY.

16

102. Was the man's infidelity news? Why would it be news? What would be accomplished by putting the man's identification with the name? If he or his wife had written to an advice columnist, they would have written anonymously, they wouldn't have given their story to the public as fodder to sell advertising.

103. That's what this lawsuit is also about, protection of a new business model: internet defamation and gossip to sell advertising.

104. The original publications, in 2000-2001 were decisions pre-Internet newspaper publication.

105. Local publisher hurt plaintiff for the purpose of helping the city council president and his associates, who were big advertisers and influenced her life in many personal ways.

106. In 2005, different motivations. Somewhere Lloyds and Sun Alliance are tracking this case.

107. The plaintiff spent a few hours last night cruising google looking at "Internet defamation".

108. It looks to plaintiff like the Jan 2005 postings were almost entirely by media lawyers seeking to reduce the industry liability. Probably the UK insurance industry re-insurers have a coordinated multi-million dollar campaign to win the defamation "Internet battleground" for the benefit of their profits, and the permanent irreversible possibly catastrophic loss of individual human freedom, self-definition and civil liberty.

109. A few years ago, the Madison newspaper ran a paper article about a woman who had started a nonprofit to help people with Internet defamation problems. There was an interview showing a very earnest looking single person working alone in a low budget

operation. She said she had thousands of files from people who had heard about her and contacted her for help.

110. Plaintiffs couldn't find the article in their piles of papers so they thought they would look it up on Google real quick and see the updates. But there was nothing there. No organization to help people with Internet defamation problems. Not just no "standing committee of important publishers and lawyers". No resources. Very few lawyers soliciting Internet defamation victims for lawsuit. One book suggesting write for retraction then sue. Various mentions of the high cost of defamation litigation, beyond the cost of most "workers".

112. The Madison newspapers have contact information to retract and correct any incorrect information. It looks like they offer to even for just plain factual errors not hurting particular parties. Wisconsin has a retraction statute, as does MN, NC, CA, FL and various other states. Wisconsin also has a stronger James Madison heritage reinforced by the name of the capital and the location of the law school in the city named for Madison. They don't seem to print defamatory articles, there aren't many complaints.

113. In Australia and the U.K., there are standing committees you, as a defamed person, are supposed to be able to write to for help. They post their contact information on the Internet. Should defamed people be the new Australian migration? But American Internet defamation sites are dominated by insurance industry lawyers advocating to use the courts now to win the business model to defame and invade the public's interests for free. And forever.

114. All you have to do is think about society's long term interests to know that allowing deliberate Internet defamation is extremely stupid and risky to peaceful existence. Who

18

does it benefit? All the money in the world isn't going to save SIMONS FAMILY MANAGEMENT if they keep on hurting people like this.

115. Basic to human nature is a possibility of using violence in perceived self-defense. If you look at the lessons of history, you will find millions of people without statistical indicators of violent tendencies, for instance, older middleclass women, who turned to violence in self-defense. It's just a fact of life.

116. Then you look at these various other people who have been, or will be defamed on the Internet. Could they become violent if they are not allowed to solve their problems in tort court because in 2003-2005 some big insurance companies influenced some judges? The answer is obviously yes, this is a real danger to society.

117. Without court, people will confront. What starts out as a word confrontation can easily spin into serious permanent injury or death. Or, for that matter, jail. If not court, then picket. Picketing leads to demonstrations leads, sometimes, to armed confrontations.

118. What would happen, for instance, if plaintiffs were convinced that they cannot stop the MEDIACOMPANY from continuing to defame them?

119. Plaintiffs have options many people don't. They could leave the country. But even somewhere else, the Internet defamation would follow. They could change their names. That would slow the Internet defamation down but it could still leak through. This could be following them to their deathbeds and greatly affect their children.

120. Plaintiffs could go to Steamboat or to Lawrence KS and find the server and the person with the passwords and demand that they delete. Where would that lead?

19

121. Remember, 4 years ago plaintiffs lost their home and lives as they know it for telling the wife of the city council president that she wasn't allowed to violate the development laws. Even though such personal on the spot confrontations are obviously problematic in their outcome, a substantial number of parties injured by Internet defamation might do that. So many people so upset that the probability of death by violence or heart attack for someone is extremely high.

122. Look at Marvin Heemeyer for instance. He was apparently upset about something his local newspaper did. So he demolished the building. But he was over 50 years old, had his own successful business, was a long-term member in the community, had a lot of friends, and had a reservoir of support from people whose mufflers he had fixed for free when they were down on their luck. He had no record of violence. Yet he did $5 million in damages and ended up dead. 123. Do you want more Marvin Heemeyers? What if one goes to THE WORLD COMPANY headquarters in Lawrence, KS because, like Heemeyer, they were denied court forum. Just like the Columbine tragedy awakened awareness of teen bullying, the Heemeyer tragedy should awaken awareness of local government/newspaper bullying. Both the Columbine teens and Heemeyer didn't perceive a safe forum for redress as being available to them.

124. When people have a real injury, as they do with Internet defamation, they must seek a forum for "redress". Court is supposed to be safe. Court is supposed to be a safe place with a fair judge and a jury of your peers to get justice. If current court decisions deny injured parties their safe forum, another forum will be found. One less safe for everyone.

125. Plaintiff has been extremely frustrated with the on-going defamations, for instance. So what does she do? Plaintiffs have been actively litigating with defendants and their associates for two years. During that time, the defendants used their power and connections within the court system to delay remedy. In this case, for instance, plaintiff has been waiting for a response for two months, a situation they didn't expect.

126. So how does non-violent intellectually oriented middle aged woman plaintiff respond? Does she forget about it? No! No, alternative forum has been found. Email! "Please try to influence the Pilot to take the defamatory stories about me off the Internet."

127. There are many problems with email forums too. No judge, No rules. No decisions. No closure. Potential to stir up "sleeping dogs". What if plaintiffs' sons take up their parents' honor or Schulenburg's husband or Jane Bennett's son? The list goes on.

128. The only responsible way for the Court to direct people's needs for redress from Internet defamation is "1.) Control defamation just as one would control pollution 2.) Once the defamation has "spilled" Notify, retract, clean up 3.) If all else fails, litigate."

129. Defendants don't need to worry too much about the opportunistic litigator because the jury will usually weed them out. So will a retraction option. But just because there are opportunistic litigators out there doesn't mean that there aren't also desperate people going to court for redress of primary rights really affecting their lives.

130. The opportunity to litigate must be available or alternative forums will be found. The alternative forums are inevitably less safe and less effective than court, imperfect as it may be.

21

131. Another key issue is that corporations are persons too.  Any decision made to this particular case will have implications for trade defamation law.  Will world prosperity be advanced if continuing defamers only have to pay for the first year, as Faegre and Benson LLP proposes?  Aren't they supposed to be patent litigators also?  Do they only represent patent violators?  Proctor and Gamble had a lot of problems overcoming the Satan conspiracy around 1986, pre Internet.  The Internet with Feagre and Benson's LLP proposed defamation immunity will leave every business and nonprofit organization totally vulnerable.  And needlessly vulnerable.

132. The Internet today is not the "wild west".  It is mostly controlled by Merchant Services, Google, Yahoo, and Microsoft.  Merchant Services already excludes most fraudulent business transactions by turning off their credit card charging privileges if there are enough complaints. Shipping services track packages.  Google, Yahoo, and Microsoft must be able, technically speaking, to incorporate some sort of sensor as to whether there is a "we have retraction/correction pubic safeguard" just like they can tell if a site is secure for credit card transactions.   To get a "credit card secure site" designation, there is an annual review and it costs.  Easy to do the same for "defamation/privacy loss-guard site".

133. In summary, current intentional republication of defamation on the Internet is a valid tort claim because it is abatable, avoidable, insurable, causes damages, promotes potentially dangerous confrontations outside of court, obstructs established liberty interests, and has no value to society.

Verification: The plaintiffs, David and Kay Sieverding, here declare under penalty of

perjury that to the best of their knowledge and belief everything included in this document

and all other court filings are true and correct.

David Sieverding                                    Kay Sieverding

641 Basswood Ave., Verona, WI 53593 608 848 5721, email

Sieverding.kay@slides.com

Professional and Financial Risks Fidelity and Crime Insurance

8/10/05 2:55 PM

| Legal Disclaimer | ProFin Home Page | Royal & SunAlliance UK | Royal & SunAlliance Group |

## Professional & Financial Risks

ROYAL & SUNALLIANCE

August 10, 2005  &

## INTRODUCTION TO FIDELITY & CRIME INSURANCE

Select Product ▲▼

**Introduction**

**News Index**

**Contact Us**

**ProFin Overview**

**Small Business**

**Forms & Wordings**

**Feedback Form**

**Claims**

**Value Added Services**

**What is Fidelity & Crime**

**Product Guide**

  **- Crime Bond**

  **- Fidelity Guarantee**

  **- Lost Documents Cover**

  **- Forged Transfer**

**Claims Examples**

**The Underwriting Team**

**The Claims Team**

**Forms & Documents**



**EMPLOYEE CRIME ON THE RISE**
The annual cost of corporate fraud in England and Wales is estimated at £10 billion and on a world-wide basis one third of all insolvencies occur as a result of corporate fraud. It is not necessarily new employees who are commiting fraud. In many cases, fraud is committed by employees who have been with the organisation for over five years.

Losses can have a damaging effect on a company's balance sheet and, could even lead to insolvency.

**HEIGHTENED RISK IN THE 21st CENTURY**
As businesses embrace new technological developments, they become inadvertent hosts to advanced exposures and an entire set of new risks. Fraud involving computers is fast becoming a problem in today's technologically enhanced society. Couple that fact with work place issues such as job insecurity and reduced company loyalty and we have an environment that increases the probability of an employee being dishonest.

**HOW FRAUD OCCURS**
Weaknesses in internal controls are the major contributing factor to the opportunity to commit crime in the workplace. Collusion between employees and third parties is the second most common element that allows fraud to thrive, followed by the type of industry involved. Retail and financial services sectors acknowledge that employee fraud is an inherent part of their business.

**IMPACT OF FRAUD ON THE BUSINESS**
It is difficult to exaggerate the effects of a significant crime on the business. The very existence of the business can be put at risk. Many cases handled by the Serious Fraud Office involve insolvency due to company assets having been stolen or misappropriated either directly by employees, or in collusion with third parties. Other than the immediate perpetrators of the fraud, those held responsible could include directors and senior management of the organisation.

**WHY INSURE?**
Whilst stringent internal controls and sound administrative and management practices help limit exposures, they can never eradicate the risk completely. Warning signs may be missed or not acted upon on time. Areas of greater risk may not be identified until too late. Contingency plans put in place to respond quickly upon the discovery of fraud may not have been communicated effectively to all staff. Whilst internal "whistle-blowing" may be regarded as an effective tool in combating fraud, not every organisation has a corresponding "no-blame" culture to promote this practice. The opportunity to commit fraud is there for everyone. This is why an insurance policy can act as a safety net, and where Royal & SunAlliance ProFin can provide protection.

**ROYAL & SUNALLIANCE PROFIN - Your choice**
The ProFin Fidelity and Crime policies offer solutions to meet the requirements of all sizes of organisation, from the smallest companies to the largest multinational conglomerates. With a dedicated claims team and a wealth of experience in handling this class of insurance, Royal & SunAlliance offers a range of financial products to meet the evolving needs of today 's clients.

**CRIME POLICY FEATURES**

- Broad definition of employee - See specimen wording for full details
- Theft, fraud, dishonesty and malicious acts committed by employees acting alone or in collusion with others
- Theft by any third party caused by an act(s)of Computer Fraud and/or Fund Transfer Fraud
- Payment of mitigation costs incurred by the insured in reducing the amount of any loss
- Payment of auditors fees incurred to substantiate the amount of a claim
- Cover for re-writing or amending computer systems or software programs necessary for correction following a valid claim under the terms of the policy
- Automatic acquisition clause
- No warranted system of control
- No policy requirement that the defaulting employees are to be prosecuted -we feel this is a matter for the insured and the police

Royal & SunAlliance is a market leader in Forged Transfer Indemnities for UK traded equities and insures many of the large registrars and share dealing firms.

We are also one of the few insurers offering Lost Document Indemnity cover.

To obtain more detailed information and documentation for each of the covers mentioned above please select from the menu bar on the left.

Please click here to discuss your requirements with one of our underwriting team

© 2003 Royal & Sun Alliance Insurance Group plc
**Please ensure you have read the Terms & Conditions and Privacy Policy before using this internet site**

Royal & Sun Alliance Insurance plc is authorised and regulated by the FSA. This can be confirmed at www.fsa.gov.uk